```
------------------------------------------------------x
```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
```
------------------------------------------------------x
```
BARBARA OLSEN, DONALD OLSEN SR.,
DONALD OLSEN  JR., and LONG ISLAND
HOUSING SERVICES, INC.,

               Plaintiffs,

    -against-

STARK HOMES, INC. D/B/A GLENWOOD
VILLAGE and BRIAN STARK,

            Defendants.
```
------------------------------------------------------x
```

Civil Action No..
09-4283 (LDW)(ETB)

**PLAINTIFFS' RESPONSES
TO DEFENDANTS'
STATEMENT PURSUANT
TO LOCAL RULE 56.1**

Pursuant to Local Rule 56.1 of the Civil Rules of this Court, Plaintiffs Barbara Olsen, Donald Olsen Sr., Donald Olsen, Jr. and Long Island Housing Services, Inc. set forth their responses to Defendants' Statement Pursuant to Local Rule 56.1.

1.      Plaintiffs admit the statements in paragraph 1, except to note that the allegation concerning Barbara Olsen is not material as that claim has been withdrawn pursuant to a stipulation between the parties.

2.      The statement in paragraph 2 does not accurately set forth the nature of the allegations of the complaint and plaintiffs refer the Court to the complaint itself for an accurate statement of plaintiffs' claims.  (See Def. Ex. A)

3.      Plaintiffs admit the statements in paragraph 3.

4.      Plaintiffs object to the statement in paragraph 4 as the allegation concerning Barbara Olsen is not material as that claim has been withdrawn, and plaintiffs reject defendants' characterization of the reason for withdrawing that allegation.

5.      Plaintiffs admit the statement in paragraph 5.

6.     Plaintiffs admit the statement in paragraph 6, except to note that Donald Olsen, Jr. was diagnosed with major depression, had attempted to commit suicide, and was released from the hospital upon condition that he would move in with his parents. (See Pls. Ex. 1, Decl. of Barbara Olsen, ¶ 3; Pls. Ex. 3 Decl. of Donald Olsen, Jr., ¶¶1-3)

7.     Plaintiffs object to and reject the statements in paragraph 7 as the defendants have failed to include a citation to supporting, admissible evidence as required by Local Rule 56.1(d).

8.     Plaintiffs object to and reject the statements in paragraph 8 as the defendants have failed to include a citation to supporting, admissible evidence as required by Local Rule 56.1(d).

9.     Plaintiffs admit to the statement in paragraph 9.

10(a).   Plaintiffs object to and reject the statements in paragraph 10 that plaintiffs went looking to move after Donald Olsen's arrest, and that they were moving more than five miles away from Donald, Jr.'s accusers, as the defendants have failed to include a citation to supporting, admissible evidence as required by Local Rule 56.1(d).

10(b).   Plaintiffs assert that they sold their home located in Ridge because Barbara Olsen had trouble navigating the stairs, and the home was too large and expensive for the family to maintain if Donald Olsen, Sr. wanted to retire (B.Olsen decl., ¶ 2).  The Olsens had been "talking about [purchasing a manufactured home at Glenwood Village] for a while."  (Pls. Ex. 2 Donald Olsen, Sr. dep. p. 26-27).

11.     Plaintiffs admit to the statements in paragraph 11.

12.     Plaintiffs admit to the statements in paragraph 12.

13.     Plaintiffs admit to the statement in paragraph 13.

13(a).   Plaintiffs current rent is $733.00 per month.  (Olsen, Sr. dep., p 54)

14(a).   Plaintiffs admit to the statements in paragraph 14.

14(b).   The first time they met, prior to filling out an application, plaintiffs informed defendants' agent, Noreen Grossklaus, that they  intended to reside with their adult son who was mentally disabled (B. Olsen decl., ¶ 5; Olsen, Sr. dep., pp. 29-30; Defendants Rule 56.1 statement, ¶¶ 18, 19; Affidavit of Noreen Grossklaus ¶ 4).

14(c).   Plaintiffs also informed the real estate agent Pat Pidgeon of their plan to have Donald Olsen, Jr. reside with them (Olsen, Sr. dep., p. 29).

14(d).   The Olsens did not add their son's name to the Glenwood application as there was no space on the application form for Donald Olsen, Jr.s' name.  The only space on the form was for two people, a husband and a wife. (Pls. Ex. 4, Stark dep. p. 27; Defs. Ex. I).

14(e)   Donald Olsen, Jr. was not going to be a purchaser of the unit, so plaintiffs did not think it was necessary to list his name on the application form.  (B.Olsen decl., ¶ 8; Olsen, Sr. dep., pp. 34-35).

14(f).   There was no intent to hide Donald Jr.s' potential residency from defendants.  (Olsen, Jr. decl., ¶ 15).  Brian Stark was made aware of the plaintiffs' accommodation request for Donald Olsen, Jr. to reside with his parents due to mental disability. (Stark dep., pp. 30, 32).

15.     Plaintiffs admit the statements in paragraph 15, but note that Brian Stark testified that he runs his business according to the 80-20 rule, which requires that at least 80 percent of the housing units are occupied with at least one person over the age of 55. (Fair Housing Act, 42 U.S.C. 3607(b)(2); Stark dep., p. 12-14).  Stark acknowledged that

20 percent of the units could be for individuals under the age of 55. (Stark dep., p. 14).

Stark also acknowledged that there are at least two Glenwood residents, Jonathan and

Robert Cioffi, who are under 55 years of age.  These residents do not conform with

Stark's policies outlined under paragraph 15, as they are not "essential to the physical

care or economic support of the Resident".  (Stark dep., pp. 15-17).  Testing conducted

by LIHS reveals that defendants do not strictly adhere to a 55 and over age policy.  (See

pls. Ex. 6 decl. of Rita Simonetti, Ex. 7 decl. of Karen Shuker, Ex. 8 dep. of Wendy

Warren, Ex. 9 decl. of Marian D. Reid).

      16.    Plaintiffs admit the statements in paragraph 16, except the statements that

the plaintiffs did not report, or indicate, that Donald Olsen, Jr. was applying, or intending,

to be a resident and that the application meant only Mr. and Mrs. Olsen would be

occupying the mobile home. (see Plaintiffs'  responses  14(a) through (f), above).

      17.    Plaintiffs object to the first sentence in paragraph 17 as the defendants

have failed to include a citation to supporting, admissible evidence as required by Local

Rule 56.1(d).  Plaintiffs admit that Stark Homes prepared a "Moving in Sheet" with

information as described.  Plaintiffs reiterate the objection to Defendant's

characterization of the residents as only "Mr and Mrs. Olsen", as outlined under

plaintiffs' responses 14(a) through (f) above.

      18.    Plaintiffs admit the statements in paragraph 18.

      19.    Plaintiffs admit the statements in paragraph 19, but note that Donald

Olsen, Sr.'s statement that "the lady did not seem to have no problem with it" refers to

Donald Olsen, Jr. residing with his parents.  (Olsen, Sr. dep., p. 29).

      20.    Plaintiffs admit to the statements in paragraph 20.

21.     Plaintiffs admit to the statements in paragraph 21

22.     Plaintiffs admit to the statements in paragraph 22.

23.     Plaintiffs admit to the statements in paragraph 23.

24.     Plaintiffs admit to the statements in paragraph 24.

25(a).  Plaintiffs object to and reject the statements in paragraph 25 because defendant Stark was aware of Donald Olsen, Jr.'s intent to reside with his parents.  (See paragraphs 14(a) through (f) above).  Stark contacted Barbara Olsen in order to request a letter inquiring whether Donald Olsen, Jr. could stay alone for short periods of time at Glenwood when Mr. and Mrs. Olsen were away without causing trouble.  (See Defendant's 56.1 statement ¶¶ 22, 24)

25(b).  Plaintiffs assert that Barbara Olsen spoke with Brian Stark prior to Donald Olsen, Jr. securing a letter from Doctor Romano.  (B. Olsen decl., ¶ 9).  Stark asked Barbara Olsen for a note reflecting whether Donald Olsen, Jr. could be left alone at Glenwood without causing trouble (B. Olsen decl., ¶ 10).  Stark believed that Mr. and Mrs. Olsen went away often for vacation and left Donald Olsen, Jr. alone (Stark dep., pp. 39-40).  Stark admits that the Romano letter was an inquiry into Donald Olsen, Jr.'s ability to be left alone at Glenwood for short periods of time at Glenwood when he testified as follows:

Q.      At some point did you have an issue whether or not he could be

        left alone?

A.      Probably later, yes.  I am just trying to be truthful.

Q.      This letter says "I understand that you have concerns regarding Mr.

        Olsen's ability to live on his own at Glenwood.", does that refresh

your recollection that you wanted a doctor's note to address the

issue of whether or not he could live alone?

A.     Yes.

Q.     There was only one doctor's note from Dr. Romano; is that correct.

A.     Yes.

Q.     During the time that you were processing the application.

A.     I only asked for one letter, yes. (Stark dep., p. 35-36).

25(c).   After the parents' application had been approved, defendants admit that "Glenwood inquired about the extent of their son's alleged disability and whether he was safe, and the community was safe, were he to be left alone." (Defendants' Memorandum of Law in Support of the Motion, p. 2).

25(d).   In response to Defendant Stark's request as set forth in paragraph 25(b), Donald Olsen, Jr. sought a letter from Dr. Romano addressing Stark's concern that he could stay alone for short periods of time at Glenwood. (B. Olsen decl., ¶ 11; Olsen, Jr. decl., ¶ 12).

25(e).   Dr. Romano testified that when he wrote the letter, he believed "that I was responding to their concern that [Donald Olsen, Jr.] could not...live independently for short periods of time. But for lengthy periods, without his parents support at that time, I don't believe he could have done that." (Pls. Ex. 5, Romano dep. p. 67) Dr. Romano "believed I was responding...accurately to Glenwood Village at the moment". (Romano dep., p. 68).

25(f).   Dr. Romano's letter clearly states that Donald Olsen, Jr. "is disabled" and that he "is diagnosed with Major Depression". (See Defendant's Exhibit M). The letter

6

clearly references that it is specifically written to address Stark's concerns "regarding Mr. Olsen's ability to live on his own **at Glenwood**.  (Emphasis added, see Defendant's Exhibit M).

25(g).  As the specific request came from Stark (see Plaintiffs' 25(b) above), there was no confusion about the intent and meaning of the letter.  However, if he had been confused, Stark made no effort to discuss the issue or seek clarification. (B. Olsen decl., ¶ 12-13; Stark dep., pp. 44-45).  Following the rejection, Stark refused to discuss the matter further with Barbara Olsen (B. Olsen decl., ¶ 13), and would not meet with Donald Olsen, Jr. (B. Olsen decl, ¶ 13; Olsen, Jr. decl, ¶ 14).   In March of 2008, Long Island Housing Services, Inc. contacted Stark asking him to reconsider his decision to deny the reasonable accommodation (B. Olsen decl., ¶ 16; Stark dep., p. 48-50).  Stark ignored this request, as well, despite the fact that the unit the Olsens wanted to purchase was available at that time and for "at least a year" following the February 5, 2008 rejection. (B. Olsen decl., ¶ 17; Stark dep., p. 45).

26.     Plaintiffs object to and reject the statements in paragraph 26 as the defendants have failed to include a citation to supporting, admissible evidence as required by Local Rule 56.1(d), except plaintiffs admit to the statements made in the last two sentences of paragraph 26.  Plaintiffs reiterate their position under paragraphs 25(a) through (g), above.

27.     Plaintiffs object to and reject the statements in paragraph 27 as the quotations do not accurately reflect the situation.  See paragraphs 25(a) through (g) above.

28.     Plaintiffs object to and reject the first sentence in paragraph 28 as the

defendants have failed to include a citation to supporting, admissible evidence as required by Local Rule 56.1(d).  Plaintiffs admit to the second sentence of paragraph 28.

29.    Plaintiffs admit the statements in paragraph 29 and reiterate the position in paragraphs 25(a) through (g) above.

30.    Plaintiffs admit the statements in paragraph 30 and reiterate the position in paragraphs 25(a) through (g) above.

31(a).   Plaintiffs object to and reject the statements in paragraph 31 as page 29 of the Donald Olsen, Jr. deposition does not support the statement made by defendants.

31(b).   Donald Olsen, Jr. dropped the letter from Dr. Romano in Glenwood's mailbox because the office was not open when he visited the site.  (Olsen Jr. decl., ¶ 13).

31(c).   Plaintiffs were not seeking residency for Donald Olsen, Jr. under Glenwood's Residency Agreement, Paragraph 9, but were instead seeking a reasonable accommodation to defendants' rules and policies (See Plaintiffs paragraphs 14(a) through (f) above, Defendant's Exhibit O (letter from M. Reid of LIHS)).

31(d).   Plaintiffs made numerous attempts to further discuss the matter and clarify Donald Olsen Jr.'s needs, but defendant refused to engage in the interactive process to clarify the request for reasonable accommodation by the Olsens.  (See Plaintiffs' paragraphs 25(g) above).  Barbara Olsen attempted to set up a meeting between Donald Olsen, Jr. and Stark, but Stark refused.  (B. Olsen decl., ¶ 13; Olsen Jr. decl, ¶ 14).

32.    Plaintiffs admit the statements in paragraph 32, except Plaintiffs object to and reject the statement that Defendants' rejection was based on Donald Olsen, Jr.'s age. Plaintiffs maintain that the rejection was based on Stark's desire to avoid the "trouble"

that Stark perceived would arise from having another mentally disabled resident in

Glenwood Village.  (B. Olsen decl., ¶13).

      33.    Plaintiffs object to and reject the statements in paragraph 33, and reiterate

the position in paragraphs 25(a) through (g), and 31(c).

      34(a).  Plaintiffs object to and reject the statements in paragraph 34 that

defendants were not aware Donald Olsen Jr. was disabled because Stark was already

aware of Donald Olsen Jr.'s disability (see Plaintiffs paragraphs 25(a) through (g)).

Plaintiffs object to and reject the statements in paragraph 34 pertaining to Barbara

Olsen's claim as those statements are immaterial because that claim has been withdrawn

pursuant to a stipulation between the parties.  Plaintiffs reject the statement in paragraph

34 that "the letter reinforced the fact that Mr. Olsen, Jr. did not suffer from a disability

that required him to live with his parents at Glenwood's over-55 community, where he

was ineligible to reside given his age" as the defendants have failed to include a citation

to supporting, admissible evidence as required by Local Rule 56.1(d), and the cited

Exhibit O contradicts defendants' statement.

      34(b)   Donald Olsen, Jr. qualifies as a person with disability under the Fair

Housing Act as he has "a physical or mental impairment which substantially limits one or

more of such person's major life activities."  (See Fair Housing Act, 42 USC 3602(h)).

His continuing state of major depression prevents him for living a normal life.  His

divorce was a direct result of his depression and suicide attempts.  His mental condition,

particularly his states of anxiety, prevents him from taking employment.  Instead, he

spends his days at a mental health clinic where he attends groups and receives

counseling.  He continues to be on a daily regiment of medication, receives weekly

therapy, and is in need of residing with his parents.  His depression has resulted in his
being hospitalized three times since 2003.  (Olsen Jr. decl, ¶¶ 2-10; Romano dep., p. 11-
12).

35(a).  Plaintiffs object to and reject the statement in paragraph 35 that Glenwood
Village strictly enforces a policy requiring residents to be 55+ years of age as Stark has
admitted to operating under the 80-20 rule and allowing individuals into the community
under the age of 55 (See ¶ 15 above; See tester information in 35b, 35c & 35d below).

35(b).  Testing conducted by plaintiff Long Island Housing Services (LIHS)
revealed that Stark does not strictly enforce his age restriction.  Based on a test conducted
March 25, 2008, tester Rita Simonetti reported the following:  "Noreen then introduced
me to the owner, Brian Stark, who said he would show me available units.   We left the
office and as we approached the first unit I said to Mr. Stark that I was turning 55 in May
and that my sister was only 49.  I asked if this would be a problem.   Mr. Stark responded
that our ages would not be a problem.  He said that they just do not want kids or babies
because it is an adult community." (See Pls. Ex. 6, Simonetti Declaration ¶ 4).

35(c).  On March 28, 2008, LIHS tester Karen Shuker visited Glenwood to
conduct a site test and inquire about purchasing a manufactured home.  Ms. Shuker
presented herself as a soon-to-be 53 year old woman.  (Pls. Ex. 8, Karen Shuker
declaration, ¶ 1).  Ms. Shuker met with Defendant Stark, who showed her around the
complex for approximately 45 minutes (Shuker decl., ¶¶ 2-3).  Ms. Shuker made sure to
mention that she was turning 53 years old, and was looking to purchase that May, as a
birthday gift to herself, but Defendant Stark never made any mention of the age
restriction or her need to wait until she was 55 years old to apply.  (Shuker decl., ¶ 4)

35(d)   On July 30, 2008, LIHS tester Wendy Warren visited Glenwood and portrayed herself as a single woman with a 40 year old mentally disabled daughter.  (Pls. Ex. 7, Wendy Warren dep. pp. 10-11).  Ms. Warren expressed interest in purchasing a unit for her and her adult daughter with mental disability. (Warren dep., p. 13).  Ms. Warren discussed this need with Defendant Stark, who stated that he needed to meet the daughter before he could make a decision about whether they would be allowed to move in, because he had had an incident with a mentally disabled man running around the park naked.  (Warren dep., p. 16).

36.     Plaintiffs object to and reject the statement in paragraph 36 that the testers were "not serious buyers", because as testers they were only inquiring as to Glenwood's practices and Stark had no way of knowing whether or not they were serious buyers. Moreover, the defendants have failed to include a citation to supporting, admissible evidence as required by Local Rule 56.1(d), the citation provided does not support Defendants' position.  Plaintiffs reiterate their position in paragraphs 35(a) through (d) above.

37.     Plaintiffs object to and reject the statements in paragraph 37 as immaterial to Defendants' Motion for Summary Judgment.

Dated: New York, New York
      March __, 2011

                                        Respectfully submitted,

By:     *Richard J Bellman*

               Richard Bellman, Esq (RB0049)
               Attorney for Plaintiffs
               99 Hudson Street, 14th Floor
               New York, NY 10013
               (212) 730-7576
               rbellman@latinojustice.org

               *Erik Heins*

               Erik Heins, Esq. (EH6320)
               Attorney for plaintiffs
               Long Island Housing Services, Inc.
               640 Johnson Avenue, Suite 8
               Bohemia, NY 11716
               631-567-5111
               erik@lifairhousing.org

To:    John L. Ciarelli, Esq. (JC0689)
       Ciarelli & Dempsey, P.C.
       Attorney for Defendants
       737 Roanoke Ave.
       Riverhead, New York 11901
       631-369-5100
       CiarelliDempsey@optonline.net

# Exhibit "1"

------------------------------------------------------------x

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x

BARBARA OLSEN, DONALD OLSEN SR.,
DONALD OLSEN  JR., and LONG ISLAND
HOUSING SERVICES, INC.,

                Plaintiffs,

     -against-

STARK HOMES, INC. D/B/A GLENWOOD
VILLAGE and BRIAN STARK,

                Defendants.

------------------------------------------------------------x

Civil Action No..
09-4283 (LDW)(ETB)

**DECLARATION OF
BARBARA OLSEN
IN OPPOSITION TO
MOTION FOR
SUMMARY JUDGMENT**

      BARBARA OLSEN, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct to the best of my ability.  I am one of the plaintiffs in the above matter and file this declaration in opposition to the defendants' motion for summary judgment.

     1.  In and about January 2008 my husband, Donald Olsen, Sr., and I began to look for new housing as we wished to move from the Ridge section of Suffolk County where they had been residing.  Our son Donald Jr., who at the time was 42 years old, resided with us because he is mentally disabled and suffers from extreme episodes of depression and cannot live alone.

     2.  We decided to sell our Ridge home because I was having trouble navigating the stairs in the house and the home was too large and expensive to maintain if and when my husband decides to retire.

     3.  Donald Jr. has lived with us since 2004 when he was released from a hospital in Columbus Ohio where he had been living.  He had been hospitalized after a suicide

attempt and he was released on the condition he had some place to go to where he would not be alone. His marriage had broken up and my husband and I were his only option.

4.    As part of our housing search we inspected modular units for sale at Glenwood Village, a mobile park community consisting of hundreds of manufactured or modular homes. The Glenwood Village development is purported to be an age-restricted 55 and older community.

5.    In January 2008, my husband and I met with a sales agent for Glenwood Village named "Noreen". I informed Noreen that we were interested in a doublewide unit which would be for me, my husband and our 42 year old mentally disabled son. At the time I was 63 years old and my husband was 65 years old.

6.    We were also shown units by Patricia Pidgeon of Little Bay Realty. Ms. Pidgeon was also informed of Donald Jr.'s age and disability and that he was to live with us.

7.    On or about January 19, 2008, my husband and I entered into a sales agreement to purchase a mobile unit situated at Glenwood from its owner, John Martin. The Martin unit was located on lot #250 in the Park. The agreement provided that the purchase price was $145,000, that the deal was to be an all cash transaction, and that the anticipated closing was to take place on or about March 1, 2008. The sales agreement stated that the purchase was contingent on "Park Approval." A copy of this agreement is attached to Defendants 56.1 Statement, Exh. D.

8.    My husband and I completed and submitted a Glenwood Village application for rental of lot #250. Defendants' 56.1 Statement, Exh. J. We did not list our son on the application as there was no space on the application designated for us to do so and it

did not occur to us to list him as Donald Jr. was not going to be a purchaser. Contrary to defendant Stark's claim, we had no intention of hiding the fact that our son would be living with us. We had informed Noreen of our intention, a fact she acknowledges in her affidavit. Affidavit of Noreen Grossklaus in Support of Defs' Motion, at ¶ 4.

9.     After filing the application, I was contacted by defendant Stark who inquired about Donald Jr.'s disability. I told defendant Stark that our son was 42 years old and that he is disabled due to a mental illness. I also stated that our son needed to live with us as he was suffering from major depression. I explained that our son attended a day program and that he also saw a therapist each week.

10.     During this conversation it came up that my husband and I have gone on vacations without our son. Defendant Stark then asked if our son was able to stay in the house alone without causing trouble. I responded that he was able to stay alone without any difficulties. Defendant Stark then requested that we provide a letter from Donald Jr.'s psychiatrist stating that he would be able to live by himself if my husband and I went on a trip and that he would not put any other residents at Glenwood in danger. This request makes clear that defendant Stark was aware of Donald Jr.'s disability.

11.     In response to defendant Stark's request, we provided him with a letter dated January 31, 2008 from Dr. Jeffrey P. Romano, a clinical psychologist working with Donald Jr. at the Opti-HealthCare DTC in Riverhead N.Y. Dr. Romano confirmed that Donald Jr. had been diagnosed with Major Depression and was disabled. Nonetheless, Dr. Romano stated that Donald Jr. was capable of staying alone at Glenwood. Defendants 56.1 Statement, Exh. M.

12.    The next thing that occurred was that I received a letter dated February 5, 2008, from defendant Stark in which he notified me that Glenwood was denying our request for residency for our son. Defendants 56.1 Statement,  Exh. N.  Defendant Stark referred to Glenwood's purported policy that all residents must be 55 or older to reside in Glenwood unless the under age resident is necessary for the physical care or economic support of the senior resident.  The letter also stated that management reserved "the right to reject any resident who does not qualify under the community's age restriction." Defendant Stark did not mention Dr. Romano's letter or that he was interpreting the note in a manner that Donald Jr. did not have to live with us.

13.    Shortly after receiving this rejection letter, I telephoned defendant Stark and asked him to reconsider his decision and to meet with me and Donald Jr.  Defendant Stark stated that he had made up his mind and he would not change his decision. Defendant Stark stated that my husband and I could come to Glenwood but Donald Jr. could not, because he did not need "that kind of trouble" and he had the right to pick and choose whomever he wanted in his Park.  At no time during this conversation did defendant Stark mention the Romano letter.

14.    I recognize that in my deposition I testified that I had one conversation with defendant Stark.  I was confused.  I had two conversations with him; one when he asked me to get the medical note and one when I  called after receiving the rejection letter.

15.    On or about February 27, 2008 Donald Jr. contacted Long Island Housing Services (LIHS) and requested its assistance with respect to what we perceived to be discrimination by defendant Stark based on Donald Jr.'s disability.   LIHS is the principal fair housing advocacy and counseling organization on Long Island.  LIHS

representatives agreed to assist us in an effort to reverse defendant Stark's rejection of our application to live at Glenwood.

16.     On March 4, 2008, Marian Reid, LIHS's senior fair housing investigator, wrote Defendant Stark and asked him to allow us to purchase the unit in question and move into the Park with Donald, Jr.  Defendants 56.1 Statement,  Exh. O.   Ms. Reid wrote that this request was based on the need for a reasonable accommodation because of Donald Jr.'s disability and cited the related Fair Housing obligations.  I am advised that defendant Stark did not respond to this letter.

17.     When Ms. Reid wrote to defendant Stark, the mobile home we contracted to purchase was still available and we were still interested in living there.

18.     LIHS also undertook testing activity by sending testers to Glenwood Village to pose as persons interested in residing there.  I am advised that these tests established that the defendants do not adhere to a strict requirement that residents of the Park be 55 or older.

19.     Also, defendant Stark testified that Glenwood is operated according to the 80/20 rule that requires that at least 80 percent of the developments units be occupied by at least one person over the age of 55.  Under this rule 20 percent of the units could be for persons under the age of 55.  (Stark  Dep. p. 14).  Since my husband and I are over 55, Donald Jr. living with us would not even effect the 20 percent limitation.

20.     Furthermore, defendant Stark testified that he has at least two current residents, Jonathan and Robert Cioffi, who are under 55 years of age.  The Coiffis' residency does not conformed to Stark's claimed strict 55 age policy as they are not

essential to the physical care or economic support of the senior resident. (Stark Dep. pp. 15-17).

21.    This all confirms that defendant Stark did not reject our son based on his age, but rather because of his mental disability.  He admitted as much to me when he said he did not need this kind of trouble at Glenwood, referring to Donald Jr.  Apparently, defendant Stark has had a troubling incident with a mentally challenged resident who was seen running around the Park naked.  See Exh. 7, Wendy Warren Deposition.

22.    In addition, even if Glenwood adhered to a strict rule that every resident had to be over 55 (except for care givers), defendant Stark was obligated to wave this rule when we requested a reasonable accommodation for Donald Jr.

Dated:  March __, 2011
        Central Islip, New York

Barbara Olsen

**Exhibit "2"**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x
BARBARA OLSEN, DONALD OLSEN, SR., DONALD
OLSEN, JR. and LONG ISLAND HOUSING SERVICES,
INC.,

                              Plaintiffs,

          -against-

STARK HOMES, INC. d/b/a GLENWOOD VILLAGE and
BRIAN STARK,

                              Defendants.
------------------------------------------------x

                         640 Johnson Avenue
                         Bohemia, New York
                         May 25, 2010
                         10:08 a.m.


          DEPOSITION of DONALD OLSEN, SR., one of the
Plaintiffs herein, taken by the Defendants, pursuant
to Stipulation and held at the above time and place
before Lori Charlwood, a stenotype reporter and
Notary Public of the State of New York.


## CERTIFIED TRANSCRIPT

```
1                           D. Olsen, Sr.                        26

2    that prevents her from driving?

3         A      Yes.  She mentioned about the heart and

4    the doctor said she would be all right for driving.

5         Q      She talked to her doctor about it?

6         A      She went to motor vehicles, she got a

7    note from a doctor and brought it into the doctor.

8         Q      As far as you know, there is no

9    restriction on her license?

10        A      No.

11        Q      Did there come a time, Mr. Olsen, that

12   you decided or you and Mrs. Olsen decided to seek or

13   attempt to purchase a manufactured home at Glenwood

14   Village?

15        A      Yes, we did.

16        Q      Was that your decision and Mrs. Olsen's

17   decision or someone else's?

18        A      Both of ours.

19        Q      Was Mr. Green also going to participate

20   in that purchase?

21        A      Not at that one, no.

22        Q      When did that decision occur?

23        A      We have been talking about it for a

24   while.  I guess when we were renting the house, we

25   come too close to the end of the lease and wanted to
```

                        D. Olsen, Sr.                        27

1

2    find something.  Cannot afford a house no more.

3    Wanted something with low maintenance.  I am getting

4    ready to retire some year and thought it would be a

5    good deal and seemed to have everything there at

6    Glenwood.

7         Q    Did you look at any other place besides

8    Glenwood?

9         A    No.  She had some friends at Glenwood

10   that she liked and they had a, like, clubhouse there,

11   swimming pool.

12        Q    So you liked it as a possibility?

13        A    It was nice.

14        Q    You had visited friends there before?

15        A    My wife has.

16        Q    How about you?

17        A    No.  I have been through there.

18        Q    How did you go about finding a place or

19   at least investigate the possibility of moving to

20   Glenwood Village?

21        A    My wife had gone to the office and spoke

22   to -- I think Noreen was her name.

23        Q    This was something that Mrs. Olsen told

24   you?

25        A    Yes.  And then Lou Bay Realty let us

D. Olsen, Sr.                                              28

1
2    know -- we have a contact with them because we dealt
3    with them before.  And they had some mobile in there
4    so we went, took a look at a couple of them.
5           Q     You went too?
6           A     Yes.
7           Q     How many units did you look at?
8           A     Three or four of them.
9           Q     Did you go on one day or more than one
10   day?
11          A     We went, I believe, on two days and kept
12   going back to this one.
13          Q     You decided to buy?
14          A     Yes.
15          Q     When you finally made the decision on
16   which unit you were going to buy, what happened, what
17   did you do next?
18          A     We told the realtor that we are
19   interested in the house, that we would like to put a
20   deposit down on it.  I found a few little things in
21   the trailer, that mobile home that had to be fixed
22   prior to us doing anything.  She spoke to Noreen on
23   the phone and she said they would take care of all
24   that.
25          Q     Did you sign an agreement with the

```
 1                    D. Olsen, Sr.                    29

 2   seller to buy?

 3        A     With the realtor.

 4        Q     With the realtor?

 5        A     Yes.

 6        Q     What about with the seller?

 7        A     They spoke to the seller, the seller

 8   went along with it.  He lived out of state.

 9        Q     Did you have a lawyer representing you

10   in this transaction?

11        A     No.

12        Q     Did you ever go to Glenwood's office?

13        A     Yes, we did.

14        Q     How many times did you go, you

15   personally?

16        A     I went once with the wife.

17        Q     What happened when you went to

18   Glenwood's office?

19        A     We spoke to Noreen, told her that we are

20   very interested in the house and we told her that our

21   son would like to come in with us.  We had spoken to

22   the realtor lady and mentioned about our son, that he

23   has a mental disability.  She did not think there

24   would be any problem with it.

25              When we went into the office at the
```

```
1                    D. Olsen, Sr.                    30
2   time, the lady did not seem to have no problem with
3   it, Noreen.
4          Q     What did you tell Noreen?
5          A     We told them that we would like to move
6   in.  We have a son that is handicapped, has a mental
7   disability and we would like to move in there.
8          Q     What did Noreen say to you?
9          A     She said that would be up to -- I forget
10  what his name is, the owner.
11         Q     Brian Stark?
12         A     Brian Stark.  She would have to bring
13  that discussion up with him.  He was not there at the
14  time.
15         Q     Did that happen the first time that you
16  went to Glenwood Village?
17         A     No, second or third.
18         Q     How many times did you personally go?
19         A     I went three times.
20         Q     So this happened on the third time?
21         A     Third time.  That is when we decided to
22  buy the house and told the realtor we wanted the
23  house and there were a couple of things -- she gave
24  us a sheet of paper and we gave a deposit of $25,000.
25         Q     I am going to show you a piece of paper,
```

```
 1                      D. Olsen, Sr.                    34

 2          Q       Was that the only time you stopped at

 3    the office for yourself, as far as yourself?

 4          A       Yes.

 5          Q       You say you spoke to Noreen and

 6    Mrs. Olsen was there with you?

 7          A       Yes.

 8          Q       Could you describe Noreen for me?

 9          A       I believe she had blonde hair.  I did

10    not pay much attention.  She seemed pleasant.

11          Q       Was Donald, Junior with you?

12          A       Donald stayed out in the car.

13          Q       Was there a reason that he stayed out in

14    the car?

15          A       He wanted us to talk business.  He felt

16    like he did not have to be there.

17          Q       I notice that Donald, Junior is not

18    listed on this application, is there a reason that he

19    is not listed on the application?

20          A       No, not that I know of.  I don't know

21    why he is not on there.  We are the buyers of it

22    here, he was not going to be one of the buyers on

23    this here.

24          Q       Is that the reason or are you just

25    speculating?
```

SUZANNE HAND & ASSOCIATES, INC.   631-277-2700   WWW.HANDREPORTING.COM

D. Olsen, Sr.                                    35

2    A      I would say that is the reason.  I don't

3  know.

4    Q      Earlier you described the conversation

5  that you had with Noreen and a reference that you

6  made to Donald.  Do you remember anything else about

7  that conversation?

8    A      Not off the top of my head, no, sir.

9    Q      Did you make any notes or record of that

10  conversation to refresh your memory?

11    A      No, sir.  I did not think I had to.

12    Q      Did you look at anything prior to coming

13  here today to refresh your memory about this case?

14    A      I looked at our statement that we gave.

15    Q      If you look at the part of the

16  application that says vehicles, there are three

17  vehicles listed.

18           Do you own three cars?

19    A      We have three cars.  My son owns a

20  vehicle, my wife drives, and I use the van for work.

21    Q      Is there an Ion in your son's name?

22    A      I am not sure.

23    Q      You have two references to Barbara

24  Mayor --

25    A      Yes.

```
 1                        D. Olsen, Sr.                     41
 2            Q      Where did your cruise go?
 3            A      We went to Puerto Rico, Labadee and
 4    St. Martinique.
 5            Q      Prior to that vacation, where was the
 6    vacation that you took prior to 2009, if any?
 7            A      We went down to Florida, to Orlando.
 8            Q      Where?
 9            A      Orlando.
10            Q      How long did you spend in Orlando?
11            A      A week, one week.
12            Q      Did Mrs. Olsen go with you?
13            A      Yes.
14            Q      Did anybody else go with you?
15            A      Yes, my son went with me.
16            Q      Did you go to Disney World?
17            A      Yes.
18            Q      How many days did you spend at Disney
19    World?
20            A      We were down there for a week, seven
21    days.
22            Q      Every day?
23            A      Yes.
24            Q      Did you drive to Florida?
25            A      No, flew down.
```

```
1                    D. Olsen, Sr.                    54
2    the place where you are living now?
3         A     Yes.
4         Q     Is that where that application is?
5         A     Yes.
6         Q     Does Mr. Green have a place in North
7    Carolina?
8         A     South Carolina.
9         Q     Have you visited that place?
10        A     No, sir.
11        Q     You've never been there?
12        A     I was there one time, I had to pick him
13   up and take him to Vermont.  He has cancer.
14        Q     When was that?
15        A     2000.
16        Q     Do you know how much it costs you to
17   live at the place where you live now?
18        A     Right now $726, I believe.
19        Q     Who do you pay that $726 to?
20        A     To Morgan, who is the owner of Thurms.
21        Q     In addition to the $726, do you pay any
22   taxes?
23        A     That is all included.
24        Q     Everything is included?
25        A     Yes, sir.
```

**Exhibit "3"**

EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
UNITED STATES DISTRICT COURT

BARBARA OLSEN, DONALD OLSEN SR.,
DONALD OLSEN  JR., and LONG ISLAND
HOUSING SERVICES, INC.,

                Plaintiffs,

      -against-

STARK HOMES, INC. D/B/A GLENWOOD
VILLAGE and BRIAN STARK,

                Defendants.
-------------------------------------------------------------------x

Civil Action No..
09-4283 (LDW)(ETB)

**DECLARATION OF
DONALD OLSEN, JR.
IN OPPOSITION TO
MOTION FOR
SUMMARY JUDGMENT**

      DONALD OLSEN, JR., pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct to the best of my ability.  I am one of the plaintiffs in the above matter and file this declaration in opposition to the defendants' motion for summary judgment.

      1.      Beginning in approximately 2002 I became aware that I was suffering from major depression.  I became nonfunctional and a business that I owned and operated deteriorated to the point that I was forced to close it down.  At this time I was living in Columbus Ohio with my wife and child.

      2.      In 2003 and 2004 I was hospitalized in Columbus for major depression and suicidal tendencies.  My last hospitalization in Columbus was in May 2004 when I was admitted for severe depression and a threat of suicide.  At this time my wife left me and I had no place to live.  Upon my discharge from the hospital in June 2004, I was told by my doctors that it would be dangerous and unacceptable for me to live alone.   The only option open to me at that time was to move in with my parents in New York.

3.      I therefore moved to my parents' home in the Ridge section of Long Island.  I have continued to live with my parents ever since.

4.      I was hospitalized again in October 2007at the Pilgrim Psychiatric Center for depression and thoughts of suicide.

5.      I continue to suffer from bouts of severe depression and anxiety and I have periodic thoughts of suicide.  When these bouts occur I tend to isolate myself.  It is therefore necessary for me to live with others who can monitor my mood swings and serve as a support group when these bouts occur.

6.      It is necessary for me to be medicated on a daily basis.  I therefore take 200 milligrams of sertraline, a drug which is designed to stabilize my mood swings; I take 100 milligrams of vistaril which is to control for anxiety; and I take 200 milligrams of lamictal which is also a mood stabilizer.  I have been on sertraline since 2003, lamictal since 2007 and vistaril since 2008.

7.      Because of my condition, particularly my states of anxiety, I cannot hold a job and my sole income is from Social Security Disability which I have been receiving since November 2004. My advocating and lobbying over mental health issues in Albany was on a volunteer basis and was part of my program at the Synergy Center, a Riverhead mental health facility.

8.      I did get a paying job in September 2010 lobbying on health issues. However, I found the job was too stressful and anxiety producing for me and I was forced to give it up in January 2011.

9.      I go to the Synergy Center daily for counseling and to attend support groups.

10.     I meet with my psychologist, Jeffrey Romano, once a week.  Dr. Romano is affiliated with the Opti-HealthCare in Riverhead, an out-patient mental health clinic.  I have been seeing Dr. Romano since October 2006.  I also see on a monthly basis my psychiatrist, Dr. Michael Manella.  Dr. Manella, who is also with Opti-HealthCare, prescribes and monitors my medications.

11.     My continuing state of major depression prevents me form living a normal life.  My divorce was a direct result of my depression and suicide attempts.  My mental condition prevents me from taking employment and instead, I spend my days at a mental health clinic.  I must take strong medications daily.  My condition also prevents me from living independently and, as a result, I continue to reside in my parents' home.  My parents serve as essential support system for me.

12.     After my parents applied for permission to move into the Glenwood Village development, my mother told me she had had a conversation with defendant Stark in which he requested we provide him with a note from my doctor.  The note was to address whether I would be able to stay alone in the Glenwood home if my parents were to go away for short periods of time.

13.     I therefore asked Dr. Romano if he would write the note and he said he would.  I told Dr. Romano that the note should state that if my parents went somewhere, I would be able and it would be okay for me to be on my own at Glenwood during  the time they were away.  I concluded that the note Dr. Romano wrote responded to Mr. Stark's inquiry.

14.     My parents asked me to deliver the note to Glenwood.  When I went there the office was closed and I put the note in the office mail box.

15.    After my mother received a letter dated February 5, 2008 from defendant Stark stating that I could not live at Glenwood, my mother and I agreed that we should make attempt to have defendant Stark change his position.  We agreed that she should call him and ask that he meet with me.  We felt that if Mr. Stark met me, he would see that I would not pose any problem for the Park.  Shortly thereafter, my mother told me she had spoken to Mr. Stark and that he had said his decision was final and did not want to meet me.

16.    The defendants attempt to make an issue out of the fact that when my parents delivered a document to Glenwood, I did not go into the office with them, but rather I stayed in the car.  They simply told me that they were dropping off something and they would be just a minute.  There was no intent to hide me from Glenwood management.

17.    I understand that defendant Stark has acknowledged in his deposition that James Cioffi is under 55 years of age and that he resides at Glenwood with his mother.   I know James Cioffi as he also is a participant at Synergy.

Dated: March __, 2011
       Central Islip, NY


                                          _____
                                          Donald Olsen, Jr.

**Exhibit "4"**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x
BARBARA OLSEN, DONALD OLSEN, SR., DONALD
OLSEN, JR. and LONG ISLAND HOUSING SERVICES,
INC.,

                              Plaintiffs,

            -against-

STARK HOMES, INC. d/b/a GLENWOOD VILLAGE and
BRIAN STARK,
                              Defendants.
------------------------------------------------x


                         640 Johnson Avenue
                         Bohemia, New York
                         June 10, 2010
                         10:06 a.m.



        DEPOSITION of WILLIAM BRIAN STARK, sued herein
as BRIAN STARK, one of the Defendants herein, taken
by the Plaintiffs pursuant to Notice and held at the
above time and place before Lori Charlwood, a
stenotype reporter and Notary Public of the State of
New York.


# CERTIFIED
# TRANSCRIPT

W. Stark                10

1
2    Q    It is an outdoor pool?
3    A    Correct.
4    Q    Do you have any recreation center on the
5  premises?
6    A    Yes, we do.
7    Q    Could you describe that for me?
8    A    Recreation center at Glenwood is
9  approximately 6,000 square feet.  We have a meeting
10  room, a fitness center, a game room, a kitchen and a
11  library.
12    Q    This recreation center is opened to all
13  residents?
14    A    Yes.
15    Q    The fitness center, how large is that?
16    A    It is probably comprised of about a
17  thousand square feet of that space.
18    Q    That is an exercise facility; is that
19  correct?
20    A    Correct.
21    Q    How many employees do you have at
22  Glenwood Village?
23    A    We have ten full-time employees and
24  eight seasonal employees.
25    Q    The full-time take care of maintenance?

W. Stark                11

1
2    A    Yes.
3    Q    Seasonal take care of gardening?
4    A    Correct, more maintenance, lifeguards.
5    Q    I want to ask you some questions
6  concerning your filing system and record keeping.
7    A    Okay.
8    Q    Do you have a file on each resident?
9    A    Yes.
10    Q    What is in the file?
11    A    Generally when a resident comes in they
12  are required to fill out an application for
13  residency.  They have to produce a copy of a photo
14  ID, generally a driver's license.  They have to have
15  a completed residency agreement and guidelines for
16  living.  And they have to have a credit check.  Those
17  are the documents.
18    Q    Are there records kept of their rental
19  payments or is that separate?
20    A    Rental payments are in that file --
21  rental payments are kept separately on a QuickBooks
22  program.
23    Q    Does the file indicate when the person
24  first occupied space?
25    A    Yes.

W. Stark                12

1
2    Q    What document in the file would do that?
3    A    The lease.
4    Q    The application is not dated?
5    A    The application is dated but generally
6  the application is filled out prior to actually
7  moving in.
8    Q    There would be a time lapse?
9    A    Generally there is a time lapse, yes.
10    Q    Do you pull the file from the active
11  files when somebody moves out?
12    A    Yes.
13    Q    Under your system you have files of 520
14  current residents?
15    A    Correct.
16    Q    You said it is a fifty-five and older
17  community.  What standard do you use?
18    A    We follow the HUD guidelines.
19    Q    That is the eighty percent of the
20  units -- you tell me what the HUD guideline is.
21    A    We have to have people in the homes who
22  are fifty-five or over to eighty percent of the
23  current population.
24    Q    At least one person?
25    A    That's right.

W. Stark                13

1
2    Q    You're operating under that regulation?
3    A    Correct.
4    Q    I previously marked as Exhibit 1 a
5  letter from your attorney to New York State Division
6  of Human Rights.  I want to ask you a question
7  (handing).
8          I highlighted something on the first
9  page.  It says, "Glenwood Village was established as
10  an over fifty-five community in accordance and
11  compliance with town and state laws.  Its restriction
12  over fifty-five resident follows from a comprehensive
13  zoning plan adopted by the Town of Riverhead is
14  consistent with the zoning ordinance and was
15  developed and maintained in the best interest of its
16  residents and the town's general welfare."
17          Do you know what the zoning ordinance
18  says with respect to your property?
19    A    The town's zoning ordinance?
20    Q    Yes.
21    A    No, I don't.
22    Q    Do you understand that you are in
23  compliance with the zoning when you are operating
24  under the HUD fifty-five standard?
25    A    I understand the law, the federal laws

W. Stark 14

1  W. Stark 14
2  preemptive of the local building codes.
3      Q    Would you look at Page 4 of this
4  letter. I have highlighted a statement.
5          "It is undisputed that Glenwood Village
6  is intending to and is operated for occupancy by
7  persons fifty-five years of age or older and at least
8  eighty percent of occupied units are occupied by at
9  least one person who is fifty-five years of age or
10 older."
11         That statement is in conformance with
12 what you just testified to; is that correct?
13     A    Yes.
14     Q    Twenty percent of the units could be
15 with people under fifty-five?
16     A    That's right.
17     Q    Isn't it a fact that you have tenants
18 that are under fifty-five?
19     A    Yes.
20     Q    Do you know how many?
21     A    To my knowledge, there are two.
22     Q    In the entire development?
23     A    Right.
24     Q    How do you know that?
25     A    They are on my lease.

W. Stark 15

1  W. Stark 15
2      Q    Have you checked all of the applications
3  to see whether or not there are others who may be
4  under fifty-five?
5      A    Not recently.
6      Q    So it is your testimony that in the
7  entire complex of 520 units, there are only two
8  people who are under fifty-five years of age living
9  in your development?
10     A    Yes.
11         MR. CIARELLI:  Who are authorized
12     residents?
13         THE WITNESS:  Who are authorized
14     residents, yes, that is correct.
15     Q    What do you mean by authorized
16 residents?
17     A    That they have signed the lease.
18     Q    Are there times when people bring in
19 younger people to live with them?
20     A    Yes.
21     Q    And do they inform you of this?
22     A    Sometimes.
23     Q    Are you aware of younger people living
24 there when you have not been informed of the lease
25 holder of that fact?

W. Stark 16

1  W. Stark 16
2      A    No.
3      Q    Who are the two that you know that are
4  under fifty-five?
5      A    Their last name is Cioffi, C-I-O-F-F-I.
6      Q    Is there somebody over fifty-five in
7  that unit as well?
8      A    Yes.
9      Q    Is that the mother?
10     A    Yes.
11     Q    Are you referring to Jonathan Cioffi?
12     A    Yes.
13     Q    Who is the second?
14     A    I believe his brother Robert.
15     Q    When did the Cioffis move in?
16     A    I am not sure but I believe it was early
17 '90s.
18     Q    And Jonathan Cioffi moved in in the
19 early '90s?
20     A    Yes.
21     Q    How old was he at that time?
22     A    I don't know.
23     Q    Do you know how old he is now?
24     A    No.
25     Q    But you know he is under fifty-five?

W. Stark 17

1  W. Stark 17
2      A    Yes.
3      Q    What were the circumstances under which
4  they moved in?
5      A    I believe they moved in with a request
6  by their parents at the time.  I believe both parents
7  were alive, that they had disabilities which would,
8  under the rules, allow them to live there.
9      Q    What rules?
10     A    The rules of my lease and the rule of
11 operating a fifty-five and over community.
12     Q    Jonathan was disabled?
13     A    That is correct.
14     Q    What is his disability?
15         MR. CIARELLI:  I just want to bring
16     up the fact that this might call for
17     disclosure of health information and I don't
18     know that my client is authorized by the
19     Cioffis to divulge that.  Maybe we can deal
20     with this in some other way.
21         Do you have an authorization from
22     them?
23     Q    I show you what has been marked as
24 Exhibit 2, it is a medical note from Vishni Seodat,
25 S-E-O-D-A-T, V-I-S-H-N-I, East End Family Practice

W. Stark                26
2 son?
3     A   To my knowledge, Pat Pigeon did not make
4 Noreen aware of that fact.
5     Q   How do you know that?
6     A   Because I don't think Noreen would have
7 started the transaction knowing that someone that did
8 not meet the terms of the lease was going to occupy
9 the home.
10    Q   You don't know for a fact that the
11 Olsens had not told -- that Pigeon had not told
12 Noreen of that, that the Olsens' son would be living
13 there?
14            MR. CIARELLI:  Objection to the form.
15            You can answer.
16            THE WITNESS:  Do you want me to answer
17 it?
18            MR. CIARELLI:  It really is the same
19        question that was already answered.
20    A   Ask me the question again.
21    Q   You don't know for a fact that Pigeon
22 did not tell Noreen that the Olsens' son would be
23 living with --
24    A   Noreen would not have started the
25 paperwork if Pat Pigeon had told her that.

W. Stark                27
2     Q   You are familiar with Plaintiffs'
3 Exhibit 4, which is the application (handing)?
4     A   Yes, I am familiar with that.  Just
5 Barbara and Donald are on the application.
6            MR. CIARELLI:  There is no question.
7     Q   Where on the application would the
8 Olsens had listed their son?
9            There is no space, is there, for it,
10 correct?
11    A   There is no space for the son.
12    Q   There is no space for anyone other than
13 two people; is that correct?
14    A   That is correct.
15    Q   According to your testimony, Noreen
16 could not approve this application on her own; is
17 that correct?
18    A   That is correct.
19    Q   And it came to you?
20    A   That is correct.
21    Q   What action did you take with respect to
22 this application?
23    A   What action did I take?
24            MR. CIARELLI:  You mean in general or
25        any specific time?  You just want him to

W. Stark                28
2    describe --
3     Q   What happened as a result of the application
4 coming to your attention?
5     A   We ran a credit check, which I believe
6 came back okay.  I reviewed it and I was ready to
7 approve it.
8     Q   At this point did you know about the
9 Olsens intending to have their son live with them?
10            MR. CIARELLI:  At which point?
11    Q   When you were ready to approve it.
12    A   I only had this and the credit report
13 and a contract to go on and I was ready to approve
14 it.
15    Q   Can you answer my question?
16            Were you aware at this point that the
17 Olsens intended to have their son live with them?
18    A   No, I was not.
19    Q   Noreen did not tell you that the Olsens
20 were intending to have their son live with them?
21            MR. CIARELLI:  Objection to form.
22    Q   You may answer.
23            MR. CIARELLI:  You can answer it.
24    A   I got something in writing on my desk
25 with information to back it up that they were

W. Stark                29
2 eligible to live subject to the terms of my lease.
3        Does that answer your question?
4            MR. BELLMAN:  Read back my question.
5            (Question read back by the reporter as
6        requested.)
7     A   Not when this was put on my desk.
8     Q   At some point you learned that the
9 Olsens were going to want their son to live with
10 them?
11    A   Subsequent to them filing this residency
12 application I found out.
13    Q   How did you find out?
14    A   The information on this was false.
15            MR. CIARELLI:  How did you find out
16        was the question.
17    A   I found out they filled out a false
18 application when verbally Noreen was informed by
19 either Pat Pigeon or the Olsens, I am not sure
20 who, that they intended to move in a nonfifty-five
21 resident.
22    Q   How did you learn this?
23    A   It was either through Pat Pigeon or
24 through Noreen or Mrs. Olsen informed Noreen.  Again,
25 I am not sure who informed Noreen but Noreen then

```
                    W. Stark              30
 1
 2    told me.
 3         Q    Donald Olsen, Senior has testified at
 4    these depositions that he filled out this application
 5    and he did it in the Martin unit and gave it to
 6    Noreen, at which time he told her of the intent to
 7    have their son live with them.
 8              Do you have any information to
 9    contradict that testimony?
10         A    I never saw Donald Olsen fill out any
11    application.
12         Q    I did not say that you did.
13         A    Yes, you did.
14              MR. CIARELLI:  I object to the form.
15              He already testified that Noreen would
16         not have processed the application if she
17         knew that there was a child living with
18         them.  To the extent that is contradictory.
19              If you are assuming there is anything
20         else, then he can answer the question.
21         Q    It is clear that at some point you
22    learned that the Olsens wanted their son to live with
23    them?
24         A    Yes.
25         Q    When was that?
```

```
                    W. Stark              31
 1
 2         A    Subsequent to them filing out a false
 3    application.
 4         Q    What is false about the application?
 5         A    They misrepresented their intention with
 6    the occupancy of the unit.
 7         Q    What should they have filled in on the
 8    application?
 9         A    They should have put everyone who was
10    going to live in the home.
11         Q    How long after this application was
12    filed did you learn of the Olsens' intention to have
13    their son move in?
14         A    It was probably inside a week.
15         Q    Did you learn from Noreen that the
16    Olsens were going to have their son move in with
17    them?
18         A    Yes.
19         Q    What did she tell you?
20         A    I believe she said that the Olsens
21    filled out a false application and that the
22    information on the application for residency was
23    incorrect, that they desired to have their son live
24    with them.
25         Q    Did she tell you anything about the son?
```

```
                    W. Stark              32
 1
 2         A    Just that he was not fifty-five.
 3         Q    Did she tell you that he was disabled
 4    and had to live with his parents?
 5         A    I am not sure who told me that he was
 6    disabled, it was either Noreen or the mother,
 7    Mrs. Olsen.  But I believe again -- this is two years
 8    hazy recollection that I believe Noreen told me that
 9    he was disabled but it could have been Barbara.
10         Q    Did you learn that he had to live with
11    them because of his disability?
12         A    I think I was told that he had to live
13    with them by Mrs. Olsen.
14         Q    Did you meet with Mrs. Olsen or did you
15    have a telephone conversation with her?
16         A    Telephone conversation.
17         Q    How did that come about?
18         A    I think I had told Noreen to call them
19    and tell them that there was a problem with their
20    application, false application and that she,
21    Mrs. Olsen, should talk to me about her situation.
22         Q    Did Mrs. Olsen call you?
23         A    Yes.
24         Q    What point in time did this conversation
25    occur?
```

```
                    W. Stark              33
 1
 2         A    Again, it was probably inside a week of
 3    the contract being signed, probably the end of
 4    January of '08.
 5         Q    What contract, the sales contract?
 6         A    The one you produced here, yes.
 7         Q    Tell me everything that you recall about
 8    that conversation with Mrs. Olsen.
 9         A    I think from what I can recall,
10    Mrs. Olsen was asking me to consider her son as a
11    disabled person and that I should relax my rules in
12    this case because of the disability.  So I inquired
13    about what the disability was and I did not have the
14    professional experience to say, you know, whether he
15    was disabled or not.  So I asked her for a doctor's
16    note, doctor's letter.
17         Q    Didn't she tell you that he had a mental
18    illness and had to live with them?
19         A    Yes, that is what she said.
20         Q    Did she tell you that he goes to a day
21    program for special care?
22         A    I believe she did inform me of that at
23    that time.
24         Q    Isn't it a fact that she told you he
25    sees a therapist each week?
```

W. Stark 34

1
2    A    She may have told me that.
3    Q    Do you recall whether she told you that?
4    A    No.
5    Q    Wasn't there a discussion with her
6  whether she leaves him alone at times when they go on
7  vacation?
8    A    I don't know if she revealed that to me
9  at that time.
10    Q    Isn't it a fact that the doctor's note
11  you asked for was to address whether he was able to
12  be left alone or not?
13    A    The doctor's note that I asked for was
14  evidence of his disability.
15    Q    And not whether he could be left alone?
16        MR. CIARELLI: Objection to the form.
17        You can answer.
18    Q    Let me put it this way, you did not also
19  ask that the doctor's note address the issue of
20  whether Donald, Junior could be left alone?
21    A    I was seeking to determine his -- if
22  there was a disability involved. So the answer to
23  that is no.
24    Q    You were not inquiring whether he could
25  be left alone?

W. Stark 35

1
2    A    I was inquiring about just at that point
3  whether he was disabled or not.
4    Q    At some point did you have an issue of
5  whether or not he could be left alone?
6    A    Probably later, yes. I am just trying
7  to be truthful.
8    Q    I have marked as Plaintiffs' Exhibit 6 a
9  letter from Dr. Jeffrey Romano to Glenwood Village
10  dated January 31, '08 (handing).
11        Are you familiar with this document?
12    A    Yes, I have a copy.
13    Q    This letter says, "I understand that you
14  have concerns regarding Mr. Olsen's ability to live
15  on his own at Glenwood."
16        Does that refresh your recollection that
17  you wanted a doctor's note to address the issue of
18  whether or not he could live alone?
19    A    Yes.
20    Q    There was only one doctor's note from
21  Dr. Romano; is that correct?
22    A    Yes.
23        MR. CIARELLI: As of what time?
24    Q    During the time that you were processing
25  the application.

W. Stark 36

1
2    A    I only asked for one letter, yes.
3    Q    Did you not conclude from reading
4  Dr. Romano's medical note that Donald Olsen, Junior
5  did not qualify as a disabled person?
6        MR. CIARELLI: Objection to the form.
7        Are you asking from a psychological
8        prospective in connection with his duties
9        as a --
10        MR. BELLMAN: However --
11        MR. CIARELLI: -- vice president of --
12        He cannot answer from a psychological
13        prospective.
14        MR. BELLMAN: However he concluded
15        that.
16    A    I concluded from this letter that
17  Donald, Junior did not meet the criteria of our lease
18  for fifty-five and over community.
19    Q    Did you conclude that he was not
20  disabled?
21    A    I can't pass judgement on that.
22    Q    I show you what has been marked as
23  Plaintiffs' Exhibit 8 (handing).
24        It is a letter from your attorney
25  written May 21, 2010 to Judge Orenstein in this

W. Stark 37

1
2  case. I have marked on the second page in the second
3  full paragraph -- third full paragraph,
4  Mr. and Mrs. Olsen presented a letter dated October 31,
5  2008 from a Dr. Romano, a psychologist, who indicated
6  that although he is disabled, it is my clinical
7  opinion that defendant had no choice but to
8  conclude -- my clinical opinion is that Mr. Olsen can
9  live independently without question.
10        Then the letter states, based on that
11  opinion, defendant had no choice but to conclude that
12  Donald Olsen, Junior did not qualify as a disabled
13  person.
14        Do you agree with that statement?
15        MR. CIARELLI: Objection to the form.
16        First of all, that letter is not
17  October 31, 2008. I think it is January.
18        MR. BELLMAN: It is May 21st.
19        MR. CIARELLI: The letter referred to
20        from Dr. Romano. The question raises all
21        kinds of issues concerning attorney/client
22        communication.
23        You are asking whether he agrees with
24        that statement, okay, either yes or no.
25    A    Well, he did not meet the terms of our

```
                    W. Stark          38
1
2   lease.
3       Q    That is not the question.
4            Do you agree with the statement that
5   based on Dr. Romano's opinion, that defendants had no
6   choice but to conclude that Donald Olsen, Junior did
7   not qualify as a disabled person?
8       A    He was not essential to the physical
9   care and economic support of his parents.  That is I
10  am reading Page 4, section nine of my lease.  So he
11  did not meet the criteria of my lease.
12           MR. BELLMAN:  Read back my question.
13           (Question read back by the reporter
14           as requested.)
15      A    I don't know if I can answer that
16  question.  He did not meet the terms of my lease.
17           MR. CIARELLI:  He is also not
18           qualified to answer that question.
19      A    I am not qualified to answer that
20  question.  I can't.
21           MR. CIARELLI:  In addition, I have
22           an objection to the basis it is attorney's
23           advocacy and argument based on the facts.  It
24           is not necessarily a factual statement that
25           the person, that the witness should be able
```

```
                    W. Stark          40
1
2       A    I found that out either from Mrs. Olsen
3   or Noreen, one of the other, but I was aware of that.
4       Q    You were aware that they went south for
5   months?
6       A    Yes.
7       Q    You learned that either from Mrs. Olsen
8   or from Noreen?
9       A    Yes.
10      Q    The Olsens had testified that they never
11  go for months to the south.
12      A    That is what they told me.
13      Q    She told you this?
14      A    Noreen or the Olsens.  It was either
15  said to Noreen or to me but that situation you are
16  referring to came to my attention.
17      Q    Did you ask her about that in your
18  conversation with her?
19      A    Yes.
20      Q    What did she say?
21      A    She said they go away.
22      Q    I show you what has been marked as
23  Plaintiffs' Exhibit 7 (handing).
24           Are you familiar with this document?
25      A    Yes.
```

```
                    W. Stark          39
1
2   to contradict or accept.  It is advocacy.
3            You are saying that the letter is a
4            fair interpretation of the letter supporting
5            the defendants' position in this case.  That
6            is all that she is saying in this letter.
7            I think it is unfair to ask the
8            witness to adopt it or not adopt it because
9            it is not a factual statement -- it is not a
10           statement of fact, I should say, but an
11           argument.
12      Q    In the paragraph above it it says,
13  "Mrs. Olsen then advised the defendants that Donald
14  Olsen suffered from depression.  He was employed but
15  had experienced a violent episode at work."
16           Did she tell you that?
17      A    Not to my knowledge, no.
18      Q    Did you ever hear, prior to this letter,
19  that Donald Olsen had experienced a violent episode
20  at work?
21      A    No.
22      Q    Then the letter continues in that they
23  went south for months in the winter leaving their son
24  to live on his own.
25           Did she tell you that?
```

```
                    W. Stark          41
1
2       Q    It is dated February 5, 2008?
3       A    Yes.
4       Q    This was written after you received
5   Dr. Romano's note?
6       A    Yes.
7       Q    In your own words, tell me why you
8   rejected the Olsens.
9       A    Based upon a false application and based
10  upon the fact that there was a resident who did not
11  qualify for residency under the terms of our lease.
12      Q    Didn't he qualify on the basis of his
13  disability?
14           MR. CIARELLI:  Objection to the form.
15      A    He didn't qualify under the criterias of
16  my lease.  These are the two sections I cited.
17      Q    When you wrote this letter of rejection,
18  you were aware that the Olsens were claiming their
19  son had to live with them because of depression and
20  his disability; is that correct?
21      A    Yes.
22      Q    You have before you Dr. Romano's letter
23  which stated that Donald, Junior suffered from major
24  depression and was disabled.
25           MR. CIARELLI:  In addition to other
```

W. Stark                42

2  things in the letter.
3      A    Right.
4      Q    Yet, you concluded he was not disabled?
5      A    I concluded he didn't -- he wasn't
6  essential to physical care and economic support of
7  the resident.
8      Q    But as a reasonable accommodation to the
9  Olsens, he would not qualify at your residence at
10 your complex?
11         MR. CIARELLI:  Objection to the form.
12     A    No, he wouldn't qualify.
13     Q    Are you familiar with the concept of
14 reasonable accommodation?
15         MR. CIARELLI:  Objection to the form.
16         Is that a legal concept under the ADA?
17     A    I can't answer that.
18     Q    I thought you operated under the 8020
19 standard --
20     A    Yes.
21     Q    -- where up to twenty percent of the
22 units can be occupied by people under fifty-five?
23     A    I do.
24     Q    So why did you reject Donald, Junior?
25     A    Because he did not meet the terms of my

---

W. Stark                43

2  lease.
3      Q    Do you reject all people under
4  fifty-five?
5      A    No.
6      Q    Other than the Cioffis, have you had
7  people request to bring in people under fifty-five?
8      A    Yes.
9      Q    What do you do?
10     A    We allow them to come in if they are
11 meeting the criteria of our lease.
12     Q    Because of the care and economic support
13 of the resident, is that the only circumstance?
14     A    Yes.
15     Q    Did you receive a call from Mrs. Olsen
16 after you had sent the rejection letter?
17     A    Yes.
18     Q    Could you tell me the substance of that
19 conversation?
20     A    No.
21     Q    You don't recall?
22     A    Correct.
23     Q    Do you recall that Mrs. Olsen asked to
24 meet with you to discuss your decision?
25     A    I believe she wanted to further discuss

---

W. Stark                44

2  my decision, yes.
3      Q    You told her that your decision was
4  final?
5      A    Correct.
6      Q    Do you recall having a conversation with
7  her at that time where you asked her whether she went
8  away and left Donald, Junior alone and she told you
9  that he was capable of being alone for limited
10 periods?
11     A    Again, I found out they were going away
12 from the home for protracted periods of time either
13 through Mrs. Olsen or through Noreen, I am not sure
14 which.
15     Q    Do you recall telling her that she and
16 her husband could come but her son could not?
17     A    I believe again, based upon the
18 application that I reviewed, it was an acceptable
19 application.  The nature of the application changed
20 once they introduced a resident who would not comply
21 with the terms of my lease.
22     Q    But do you recall saying that Mr. and
23 Mrs. Olsen could come but not Donald, Junior?
24     A    That essentially is what that statement
25 means, yes.

---

W. Stark                45

2      Q    Did you also say I do not need that kind
3  of trouble?
4      A    I don't recall saying that.
5      Q    Did Mrs. Olsen offer to have you meet
6  her son?
7      A    I don't recall if she offered that.
8      Q    But she may have?
9      A    She may have.
10     Q    When did the Martin unit get sold?
11     A    I am not sure.
12     Q    Do you have any idea how long after
13 this?
14     A    It was at least a year.
15     Q    Another year passed before Martin was
16 able to sell his unit?
17     A    I believe so, yes.
18     Q    Can you tell me what the rental cost
19 today is on that site?
20     A    $459 a month.
21     Q    Does that include taxes?
22     A    No.
23     Q    Do you know how much the taxes are?
24     A    Taxes will vary depending upon the
25 circumstances of the owners of the home.  I am not

W. Stark                    46

2  sure what the full assessment is, but approximate tax
3  on that house is approximately $300, a full tax bill.
4     Q    Are you familiar with this document
5  (handing)?
6     A    Yes.
7     Q    What is a moving-in document?
8     A    The moving-in document is a document
9  supplied by Stark Homes to residents who are moving
10 in to make their move in easier.
11    Q    At what point in the process was this
12 issued?
13    A    Noreen probably gave it to them at the
14 time she gave them the application for residency.
15    Q    This says taxes at the time were $99,
16 have they gone up?
17    A    Yes.  Again, I was going off the top of
18 my head on a home of that nature.  They have gone up
19 a little so they are -- taxes could be quoted for
20 what the tax bill that the Martins had at the time.
21 Because the way taxes work on manufactured housing is
22 you pay the tax bill with the home, so the Martins
23 may have had a Star credit or other credit on their
24 tax bill that they avail themselves of which reduce
25 their taxes.

W. Stark                    47

2     Again, I am not sure what the full tax
3  bill on that home is or was.
4     Q    Can you find out?
5     A    Sure, I can let you know.
6         MR. BELLMAN:  If we leave a space in
7     the deposition, you will fill in the amount
8     of taxes.
9         MR. CIARELLI:  Recognize that it is
10        dependent on the eligibility for exception
11        that the current residents might have.
12        MR. BELLMAN:  Most of the elderly are
13        entitled to Star.
14        THE WITNESS:  I can give you a full
15        assessment on the home.
16        MR. CIARELLI:  You want a full
17        assessment on the home?
18        MR. BELLMAN:  Yes.
19 (INSERT)_____
20    Q    I show you what has been marked as
21 Plaintiffs' Exhibit 9.  It is a letter from Long
22 Island Housing Services to you.  It is marked Brian
23 Stake but obviously the intent was to be Brian Stark
24 (handing).
25        Do you recall receiving this letter?

W. Stark                    48

2     A    Yes.
3     Q    At this point the Olsens were still
4  interested in purchasing the Martin home; is that
5  correct?
6         MR. CIARELLI:  Objection to the form.
7     A    The letter seems to indicate that
8  desire, yes.
9     Q    The unit had not sold at this point?
10    A    Correct.
11    Q    On the second page third paragraph, it
12 states that, "Therefore this letter is to serve as a
13 request for reasonable accommodation and that you
14 allow Mr. and Mrs. Olsen to rent lot 250 at Glenwood
15 Village and also to permit Donald, Junior to reside
16 at Glenwood Village with his parents."
17        When you received this, did you have an
18 understanding as to what was meant by "reasonable
19 accommodation" under the law?
20    A    The Olsens did not meet the criteria of
21 my lease so I did not respond to the letter.
22    Q    Did you make an effort to find out what
23 was meant by "reasonable accommodation"?
24    A    No.
25    Q    Were you represented by counsel at this

W. Stark                    49

2  point?
3     A    I don't know.  I am not sure if I
4  retained counsel at this point.  I probably hadn't
5  because --
6     Q    This was before the complaint was filed
7  with the State Division so you were not represented
8  by counsel?
9     A    That is correct.
10    Q    The letter cites the various statutes
11 and regulations to support the claim of reasonable
12 accommodations; is that correct?
13    A    Yes.  In this letter it cites the
14 disability act and some other fair -- yes, it does.
15    Q    It says it is unlawful to refuse to make
16 reasonable accommodations in rules, policies,
17 practices or services when such accommodation may be
18 necessary to afford a person with a disability an
19 equal opportunity to use and enjoy a dwelling.
20        Did you read that at the time you
21 received the letter?
22    A    Yes.
23    Q    But you did not respond?
24        MR. CIARELLI:  Objection to the form.
25    A    I think I faxed this to my lawyer.

W. Stark                    50

1
2      Q    Was there any reason why you did not
3  respond to the letter?
4           MR. CIARELLI:  Objection to the form.
5      A    I referred to counsel.
6      Q    I show you what is marked as Plaintiffs'
7  Exhibit 10.  It is a test narrative by Rita Simonetti
8  (handing).
9           Do you recall meeting with Rita
10  Simonetti?
11     A    No.
12     Q    Would you take a minute and read this
13  narrative report.
14          (Witness complying.)
15     A    Okay.
16     Q    On Page 3 of the report Rita Simonetti
17  writes, I reminded him that -- she was discussing her
18  movement around the Village with you at the time.
19  That I was turning fifty-five in May and that my
20  sister was only forty-nine and asked if that was a
21  problem.  He said, no, that was fine, just that they
22  don't want young kids or babies because it was an
23  adult community.
24          But he did say that in some cases there
25  might be younger people only because they have to

---

W. Stark                    51

1
2  take care of their elderly parents or family.
3           Do you recall saying that?
4      A    No, I don't know recall meeting Rita
5  Simonetti.
6      Q    Would you tell an applicant who wanted
7  to move in with a forty-nine year old sister that
8  that would be all right?
9           MR. CIARELLI:  Objection to form.
10          Calls for speculation.
11     A    I don't want to speculate about that.
12     Q    What was your answer?
13     A    I would rather not speculate.
14          MR. BELLMAN:  Read back my question.
15          (Question read back by the reporter as
16  requested.)
17     Q    You can answer that question.
18          MR. CIARELLI:  The answer calls for
19  speculation.
20     A    I would rather not speculate on a
21  hypothetical.
22     Q    Is it possible that you would approve
23  such an application?
24          MR. CIARELLI:  Objection to the form.
25     A    All residents need to meet the terms of

---

W. Stark                    52

1
2  my lease.
3      Q    What you told Rita Simonetti differs
4  from that?
5           MR. CIARELLI:  Objection to the form.
6           Argumentative.  He does not recall
7      speaking to Rita Simonetti.
8      A    I have no recollection.
9      Q    Is it possible that you had this
10  conversation with Rita Simonetti?
11          MR. CIARELLI:  Objection to the form.
12     A    That is speculation.
13     Q    Is it possible that you had such a
14  conversation?
15     A    I don't know.  It is speculation.
16          MR. CIARELLI:  He does not recall.
17     A    I don't recall.  I don't recall Rita
18  Simonetti at all.
19     Q    If you had told this to Rita Simonetti,
20  it would differ from what you had testified to here
21  today as being your policy; is that correct?
22     A    All residents need to meet the criteria
23  of this lease that I have codified.
24     Q    What Rita Simonetti reports is different
25  from that; is that correct?

---

W. Stark                    53

1
2          MR. CIARELLI:  What is on the
3      statement is different from that?
4          MR. BELLMAN:  Yes.
5      A    Again, Rita Simonetti is not my
6  resident.
7      Q    Can you answer my question?
8          MR. CIARELLI:  Note my objection to
9      the form.
10     A    Yes, it is.
11     Q    Do you want the question read back?
12     A    I don't know what you are asking.
13          MR. BELLMAN:  Read the question back.
14          (Question read back by the reporter as
15  requested.)
16     Q    Different from your policy.
17          MR. CIARELLI:  Just note my
18      objection.
19          The problem is it assumes that A, Rita
20  Simonetti's testimony is truthful.  B, that
21  this was a policy that is reflected in her
22  testimony.  And if you are comparing this
23  policy and reflecting it against her
24  statement with the defendants' policy, you
25  know, it is just --

---

**Exhibit "5"**

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x
BARBARA OLSEN, DONALD OLSEN, SR., DONALD
OLSEN, JR. and LONG ISLAND HOUSING SERVICES,
INC.,

                              Plaintiffs,


            -against-


STARK HOMES, INC. d/b/a GLENWOOD VILLAGE and
BRIAN STARK,

                              Defendants.
------------------------------------------------x


                    737 Roanoke Avenue
                    Riverhead, New York
                    November 9, 2010
                    2:22 p.m.



        VIDEOTAPED DEPOSITION of JEFF ROMANO, a
Non-Party Witness in the above-entitled caption,
taken by the Defendants and Plaintiffs, pursuant to
Subpoena, and held at the above time and place before
Lori Charlwood, a stenotype reporter and Notary
Public of the State of New York.

CERTIFIED
TRANSCRIPT

SUZANNE HAND & ASSOCIATES, INC.   631-277-2700   WWW.HANDREPORTING.COM

11

1              J. Romano
2        A        No.  I know that that person is there
3   for therapy and then I make the determination as to
4   what I will be doing with the individual after a few
5   sessions.
6        Q        Did there come a time that you made such
7   a determination for Mr. Olsen?
8        A        Yes.
9        Q        What was that determination?
10       A        Based on the diagnosis and my
11  interaction with Mr. Olsen, I determined that he was
12  depressed and I would be treating him for depression.
13       Q        Did you develop a treatment plan for
14  that depression?
15       A        Yes.
16       Q        What was that treatment plan?
17       A        Individual therapy, weekly individual
18  therapy.
19       Q        When you say "diagnosis," who achieved
20  the diagnosis?
21       A        I don't know.  I don't know who did the
22  initial diagnosis.  It was there when I got the case.
23       Q        Do you know what the diagnosis was?
24       A        Major depression.
25       Q        Do you know what the DSM number is?

12

```
1                      J. Romano
2         A     311 -- I'm sorry, I can't tell you off
3    the top of my head.
4         Q     Would it refresh your recollection to
5    say it was 296.32?
6         A     That makes sense, yes.
7         Q     Are you familiar with the DSM diagnosis
8    296.52?
9         A     I can't tell you off -- I can't without
10   it in front of me.
11        Q     Do you know who achieved the diagnosis
12   of major depression under DSM 296.52?
13        A     I don't know initially, no.
14        Q     Would you expect that was his diagnosis?
15        A     Yes.
16        Q     What happened at the session, at the
17   treatment session on October 14th?
18        A     Of which year?
19        Q     2010.
20        A     He and I discussed, according to my
21   notes here, he discussed a job that he received
22   through NYAPRS which is an ethnicity group or mental
23   health.  He was given a position with them and was
24   very excited but that was my last contact with him.
25        Q     What did you understand that position to
```

68

1                  J. Romano

2   to explain myself a little bit more.  I don't

3   remember the date of that letter.

4          Q      I will show you that letter in a

5   minute.

6                  Was it the fact of the second letter

7   that caused you -- when you were asked to do the

8   second letter, was that the first time that you

9   realized that this letter was inaccurate?

10         A      I believe so.

11         Q      As far as you knew, when you wrote this

12  letter in January of '08, you thought it was -- you

13  believed it was accurate?

14         A      I believed I was responding to the

15  Glenwood Village accurately at the moment.

16         Q      As Donald Olsen related their request to

17  you?

18         A      Yes.

19         Q      Do you recall when for the first time

20  you were told that it wasn't responsive to what was

21  being asked?

22         A      I don't recall exactly but I believe it

23  was the date of the second letter.

24                  MR. CIARELLI:  We will mark the

25                  second letter then as Exhibit C.

69

```
 1                    J. Romano
 2                    (Letter dated 3/5/09 was marked as
 3                    Defendants' Exhibit C for Identification
 4                    as of this date.)
 5          Q      What was the circumstance surrounding
 6    the writing of the second letter?
 7          A      I don't recall exactly.
 8          Q      Do you remember who, if anyone, asked
 9    you to write the second letter?
10          A      I believe Don did, Don asked me.
11          Q      Did he ask you questions that you should
12    respond to?  What did he say to you?
13          A      I don't recall honestly.
14          Q      Was it your intention at that time to
15    provide the information that was being requested by
16    Mr. Olsen?
17          A      I believe it was my intention to give a
18    clearer picture of the history of his depression how
19    it affected his life over the years.
20          Q      As you sit here today, would you say
21    that he was in better psychological condition in
22    March of '09 than he was in January of '08?
23          A      I can't say that.  I don't know.
24          Q      After we boringlessly reviewed the
25    records, based on the review of that record, are you
```

**Exhibit "6"**

```
-------------------------------------------------------------x
```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
```
-------------------------------------------------------------x
```

BARBARA OLSEN, DONALD OLSEN SR.,
DONALD OLSEN  JR., and LONG ISLAND
HOUSING SERVICES, INC.,

               Plaintiffs,

     -against-

STARK HOMES, INC. D/B/A GLENWOOD
VILLAGE and BRIAN STARK,

              Defendants.
```
-------------------------------------------------------------x
```

Civil Action No..
09-4283 (LDW)(ETB)

**DECLARATION OF
RITA  SIMONETTI
IN OPPOSITION TO
MOTION FOR
SUMMARY JUDGMENT**

     RITA SIMONETTI, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct to the best of my ability.

1.    In 2008 I was residing in Long Island, New York.  I am currently residing in Raleigh, North Carolina.  While residing in Long Island, I volunteered to assist Long Island Housing Services ("LIHS") by serving as a tester in some of its cases.  As a tester I would be assigned to go real estate developments and inquire about the availability of housing units.

2.    On March 25, 2008 I undertook a test of Glenwood Village at the request of Marian Reid, a representative of LIHS.  My instructions were to go to Glenwood and represent that I was looking to purchase one of the modular units in the park.  I was to represent that I would be living there with my sister.  I was to give my age as 54 and my sister's age as 49.  Glenwood is a development which is designated for persons 55 and older and my test was to ascertain what action Glenwood takes when presented with a potential applicant under 55 years of age.

3.       At Glenwood I first met with a receptionist named Noreen.  I told Noreen that I was interested in purchasing a two or three bedroom home for my sister and me.  I asked Noreen if Glenwood was a 55 and over community.  She answered that it was and I told her my sister was 49.  I asked if that would be a problem and she said I should speak to the owner about it.

4.       Noreen then introduced me to the owner, Brian Stark, who said he would show me available units.   We left the office and as we approached the first unit I said to Mr. Stark that I was turning 55 in May and that my sister was only 49.  I asked if this be a problem.    Mr. Stark responded that our ages would not be a problem.  He said that they just do not want kids or babies because it is an adult community.  He also said that in some cases there might be younger people only because they have to take care of the elderly parents or family members.

5.       Mr. Stark continued to show me five available units located throughout the park.  During this tour of Glenwood Mr. Stark asked whether my sister and I still worked and I said we did.  He discussed mortgages and loans on modular homes and he drove me all around the community.  When we returned to the office he gave me a folder with information regarding Glenwood.  I thanked him and told him I would discuss what I had seen with my sister.

Dated: March 10, 2011
       Raleigh, North Carolina

Signed: _Rita Simonetti_
       Rita Simonetti

**Exhibit "7"**

RECEIVED

MAR 0 4 2011

Long Island Housing Services

-----------------------------------------------------------x

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

BARBARA OLSEN, DONALD OLSEN SR.,
DONALD OLSEN  JR., and LONG ISLAND
HOUSING SERVICES, INC.,

              Plaintiffs,

     -against-

STARK HOMES, INC. D/B/A GLENWOOD
VILLAGE and BRIAN STARK,

              Defendants.

-----------------------------------------------------------x

Civil Action No..
09-4283 (LDW)(ETB)

**DECLARATION OF
KAREN SHUKER
IN OPPOSITION TO
MOTION FOR
SUMMARY JUDGMENT**

KAREN SHUKER, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct to the best of my ability.

1.    On March 28, 2008, I volunteered to assist Long Island Housing Services ("LIHS") by serving as a tester in its case involving Glenwood Village.  As a tester I was assigned to go to Glenwood, advise whomever I met with that I was interested in buying a modular unit and that I was going to be 53 years old.  I understood that Glenwood is a 55 and older development  and I was to ascertain the reaction to my being a potential purchaser who was under 55 years of age.

2.    On March 28, 2008 at about 3:00 pm I entered the Glenwood office at 1661 Old Country Road, Riverhead and met with a man who introduced himself as Brian Stark.  I told Mr. Stark that I was looking to buy a 2 to 3 bedroom unit for myself. He told me he had new and resale units to show me and I said my price range was up to $200,000.

3.    Mr. Stark grabbed keys and we went into his car to look at the units.  While still in the office I told him that I currently live with my mother and I needed to get out.

During our inspection of the different units, all of which took about 45 minutes, we discussed taxes, lawn maintenance, utilities, upgrading, pets and financing.

4.     During the inspection I made sure to mention that I had my 53rd birthday coming up and that buying a home would be a nice birthday present for me.  He responded, "I thought that was a push," which I took to mean that I did not look my age.  He never said anything more about my age, even though I told him I was hoping to purchase and move in May 2008.

5.     During our inspection he received a call that gave me the impression he had to pick up someone.  We looked at one more unit and he told me I could inspect a model near the office on my own.  We returned to the office where he gave me his business card and told me to call if I needed more information.

Dated:  March  2 2011                    Signed: _Karen Shuker_
         Central Islip, New York                Karen Shuker

2

**Exhibit "8"**

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------X

BARBARA OLSEN, DONALD OLSEN, SR.,
DONALD OLSEN, JR. and LONG ISLAND
HOUSING SERVICES, INC.,

                    Plaintiffs,

          -against-

STARK HOMES, INC. d/b/a GLENWOOD
VILLAGE and BRIAN STARK,
                    Defendants.

----------------------------------------X

                    June 23, 2010
                    4:07 p.m.

                    640 Johnson Avenue
                    Bohemia, New York

          DEPOSITION of WENDY WARREN, A
Non-Party Witness herein, taken by the
Defendants, pursuant to Article 31 of the Civil
Practice Law and Rules of Testimony, and
Stipulation, held at the above-mentioned time
and place, before Donna L. Ritzmann, a Notary
Public of the State of New York.

CERTIFIED
TRANSCRIPT

10

1                            W. Warren

2          A       I was just told her name.  And I can't

3     remember her name.

4          Q       Was it Marian Reid?

5          A       (No verbal response).

6          Q       If you don't remember it's okay.

7          A       I don't remember.  No, it was Jeanine.

8     I'm sorry, it was someone named Jeanine.

9          Q       Did Jeanine tell you anything other

10    than what you already said that there was an

11    assignment available and are you interested?

12         A       No, that was the phone call.

13         Q       What did you do in response to that

14    phone call?

15         A       I received the scenario.  I agreed to

16    do the assignment because it was right near my house.

17    It was, um, close by.  I got the assignment, read it

18    over.  And, ugh, learned what the scenario was and

19    went and did the assignment.

20         Q       What was the assignment as you

21    understood it?

22         A       The assignment was to go to this

23    location called Glenwood Landing in Riverhead.  And I

24    was a single woman with a 40-year old daughter who was

25    mentally disabled.  Um, it went on to tell me that I

11

W. Warren

1
had sold my house and I was ready to move in in

3    September.  And I was looking to buy a unit in this

4    community.

5           Q       Had you ever been to Glenwood before?

6           A       No, I haven't.

7           Q       Do you know anybody that lives there?

8           A       No, I don't.

9           Q       Are you single?

10          A       Yes.

11          Q       Do you have a daughter, 40-year old

12   daughter?

13          A       I have a 45-year old daughter.

14          Q       Okay.  Does she live with you?

15          A       No, she doesn't.  Thank God.

16          Q       Do you live alone?

17          A       Yes.

18          Q       Now, did I understand you correctly to

19   say that you got your assignment in written form?

20          A       Yes.

21          Q       How much time elapsed from the time you

22   got the telephone call from Jeanine until the time

23   that you got the assignment?

24          A       Don't remember.  Probably days.

25          Q       Days?

12

1                          W. Warren

2          A        Within the week.

3          Q        Okay. In addition to that written

4    assignment did you receive any other instruction with

5    respect to the assignment?

6          A        No.

7          Q        So did there come a time that you began

8    to perform that assignment?

9          A        Yes.

10         Q        Do you remember when it was?

11         A        I believe it was July 30th of 2008.

12         Q        Did you make any notes or independent

13   notes other than on Long Island Housing Services forms

14   or stationary concerning this assignment?

15         A        No.

16         Q        Did you keep a diary or record of your

17   activities on July 30th, 2008 other than what you have

18   reported to Long Island Housing --

19         A        No.

20         Q        (Continuing) Services?

21                  So could you tell me what happened on

22   that day?

23         A        I drove to, ugh, Glenwood Landing.

24   Parked my car. Walked into the, um, main office.

25   There was a woman sitting there, receptionist. Her

13

W. Warren

2   name was Noreen.  I told her I would like to speak to

3   someone about possibly buying a unit.  She asked me,

4   um, if I was interested in a new unit or a used unit?

5   And I said it really -- either-or.  But that I was

6   ready to move by September.  She told me that the new

7   units would not be ready by September, but that I

8   could still look at some of the units.  She asked how

9   many people were in my family?  I told her it was

10   myself and my grown daughter who had a mental

11   disability.  She then told me that I would have to

12   speak to a gentleman named Brian because it was an

13   over 55 community and my daughter was not over 55.

14   Um, Brian was not on the premises.  She said he'd be

15   back, but if I wanted to, I could go and look at some

16   of the units.  So she wrote down on a piece of paper

17   three different models that I could go to.  Got back

18   in my car, drove to each unit, looked at them.  Came

19   back to the office.  Brian still wasn't there.  I sat

20   and I waited a few minutes.  Gentleman named Brian

21   showed up.  And I, I believe that Noreen had already

22   spoken to him and told him that I was there to buy a

23   unit.  And that I --

24         Q     Okay.  Go ahead.  I'm sorry to

25   interrupt you.  What was the basis of your belief that

14

W. Warren

2    she had already spoken to him?

3          A         Because he asked me about my daughter.

4          Q         Is there any other, other than that do

5    you have any other --

6          A         No.  No, but he already knew that I was

7    single with a grown daughter.

8          Q         And you know that because he asked you

9    about your daughter?

10         A         Yes.

11         Q         Anything, any other reason that you

12   would think that he already knew that other than that

13   he asked you about your daughter?

14         A         No, but how else would he know?

15         Q         I'm just asking.

16         A         No.  He already knew that I was looking

17   for a place to buy and that I had a grown daughter

18   with a handicap.

19         Q         Well, now you had one conversation with

20   Noreen?

21         A         Mm-hmm.  Yes.

22         Q         And that conversation that you just

23   related was the first conversation you had with

24   Noreen?

25         A         I'm sorry, repeat that.

15

W. Warren

2       Q     Yes.  When earlier you said you went to
3 Glenwood's office and you spoke to Noreen and you told
4 her that you were looking for a unit and you had a
5 grown daughter who was 40 year's old and had a mental
6 disability --

7       A    Yes.

8       Q    (Continuing) Was that during the first
9 conversation that you had with Noreen?

10      A    Yes.

11      Q    Now, after that first conversation did
12 you have any other conversations with her?

13      A    With Noreen, no.

14      Q    So now you had waited for Brian to come
15 to the office?

16      A    Yes.

17      Q    And he arrived.  And you had a
18 conversation with him?

19      A    Correct.

20      Q    Where did that conversation take place?

21      A    Right there in the office.

22      Q    In the outer office or the inner?

23      A    The outer office.

24      Q    In your best recollection what did you
25 say to him and what did he say to you?

SUZANNE HAND & ASSOCIATES, INC.   631-277-2700   WWW.HANDREPORTING.COM

16

W. Warren

A     I told him that I went and looked at the units. And that I was interested in most likely purchasing one. He asked me, um, if he could meet with my daughter. And he went on to tell me that they had an incident of a mentally, um, handicapped man that lives in the park who they found running around naked. Um, again, he asked me to meet with my daughter. He said I'd like to meet with your daughter and speak with her.

Q     What did you say in response to that, if anything?

A     I didn't. I just said well, thank you. And I left.

Q     Did you say anything in response to his statement about the naked man running around?

A     No. No.

Q     How long did that meeting with Brian take place, how much time elapsed?

A     Maybe 10 minutes.

Q     Did you sit down at all during the course of it?

A     Yes.

Q     Where did you sit down?

A     I believe I was at a desk with him.

42

W. Warren

1

2  her daughter?  I mean this may have happened, but

3  right now I don't remember that happening.

4      Q      Do you remember anyone ever telling you

5  that you could not live there with your daughter?

6      A      They didn't say I couldn't or I could.

7      Q      So when you spoke to Marian Reid did

8  you have any reason to believe that you would not be

9  able to live there with your fictitious daughter?

10     A      No.

11     Q      Other than that is there anything --

12     A      Everything else seems, um, in order.

13     Q      Okay.  Is there omitted anything that

14  you remember telling her during that telephone

15  conversation?

16     A      No.

17     Q      Do you recall how much you got paid for

18  doing this test?

19     A      Not offhand.

20     Q      Do you know how the payment structure

21  works, is it by the hour?

22     A      It's hourly and gas mileage.

23     Q      Do you know how much it was per hour?

24     A      Um, either 10 or 15 an hour.

25     Q      Do you get paid by check or some other

**<u>Exhibit "9"</u>**

```
-----------------------------------------------------------x
```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
```
-----------------------------------------------------------x
```
BARBARA OLSEN, DONALD OLSEN SR.,
DONALD OLSEN  JR., and LONG ISLAND
HOUSING SERVICES, INC.,

              Plaintiffs,

      -against-

STARK HOMES, INC. D/B/A GLENWOOD
VILLAGE and BRIAN STARK,

             Defendants.
```
-----------------------------------------------------------x
```

Civil Action No..
09-4283 (LDW)(ETB)

**DECLARATION OF
MARIAN D. REID
IN OPPOSITION TO
MOTION FOR
SUMMARY JUDGMENT**

MARIAN D. REID, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the following is true and correct to the best of my ability.

1.     In 2008 I was employed by Long Island Housing Services, Inc. ("LIHS") as the Senior Fair Housing Investigator.  I currently hold the title of Fair Housing Program Manager.  Among other duties, I organize and facilitate testing.

2.     In March of 2008, I sent a letter to the defendants on behalf of the Olsen family seeking reasonable accommodations that would allow Donald Olsen, Jr. to reside with his parents at Glenwood.  This letter detailed that Donald Olsen, Jr. was disabled and that it was necessary because of his disability to live with his parents.  Defendants never responded to this letter.

3.     From March 25th, 2008 through July 30th 2008, I coordinated testing of Glenwood Village to determine whether defendants were engaging in unlawful discrimination on the basis of disability.  In particular, I was testing to ascertain whether the defendants consistently adhered to a 55 and over policy.  Testing consisted of three independent site

visits from three different testers.

4.      The testers were instructed to present specific profiles to the defendants, but they were not informed of their role as a protected or comparison tester, or the basis of discrimination for which the test was being conducted. This ensures that the testers maintained a level of neutrality and impartiality while performing these tests.

5.      The testers are asked to report on the factual events that occurred during their site visit to Glenwood.  Testers did not and were not asked to offer a conclusion as to whether discrimination occurred.  As the testing coordinator, I analyze the data gathered by the individual tests and make a determination as to whether the testing reveals that discrimination has occurred.

6.      I reviewed the report from each test in conjunction with information provided by the Olsens.  The results supported the conclusion that defendants discriminate on the basis of disability.  The testing evidence revealed that defendant Stark was willing to rent to individuals who did not meet Glenwood's age requirement, that defendant Stark's primary concern with age was that no small children reside at Glenwood, and that Defendant Stark became hesitant of an applicant when he was informed that she had a mental disability.  Stark requested to meet this applicant prior to considering her for residency, a condition that was not imposed on any other non-disabled applicant regardless of age.  The testing supported the allegations made by the Olsen family that Donald Olsen, Jr. was denied due to his mental disability and not because of the defendant's purported age requirement.

7.      Defendants assert that the testing results are invalid because the testers did not submit an application to Glenwood, leave a deposit, or provide personal information.  It

2

was not necessary for an accurate analysis of defendants' practice to have the testers

submit an application to Glenwood, nor was it necessary for them to leave behind

personal information in order to ascertain whether Glenwood adhered strictly to its 55

and over policy.  The information provided by each tester was sufficient to prove that

defendants engaged in a practice of discriminating against the mentally disabled under

the pretext of a strict adherence to their purported age policy.


Dated:  March 22, 2011                    Signed: _____
         Bohemia, New York                         Marian D. Reid

3

**Exhibit "10"**

that causes him to be physically violent when he stops taking his prescribed medication. Suggesting that his client will not pose a direct threat to others if proper safeguards are taken, the attorney requests that the rental manager grant James X an exception to the "no threats" policy as a reasonable accommodation based on James X's disability. The Shady Oaks rental manager need only grant the reasonable accommodation if James X's attorney can provide satisfactory assurance that James X will receive appropriate counseling and periodic medication monitoring so that he will no longer pose a direct threat during his tenancy. After consulting with James X, the attorney responds that James X is unwilling to receive counseling or submit to any type of periodic monitoring to ensure that he takes his prescribed medication. The rental manager may go forward with the eviction proceeding, since James X continues to pose a direct threat to the health or safety of other residents.

## 6. What is a "reasonable accommodation" for purposes of the Act?

A "reasonable accommodation" is a change, exception, or adjustment to a rule, policy, practice, or service that may be necessary for a person with a disability to have an equal opportunity to use and enjoy a dwelling, including public and common use spaces. Since rules, policies, practices, and services may have a different effect on persons with disabilities than on other persons, treating persons with disabilities exactly the same as others will sometimes deny them an equal opportunity to use and enjoy a dwelling. The Act makes it unlawful to refuse to make reasonable accommodations to rules, policies, practices, or services when such accommodations may be necessary to afford persons with disabilities an equal opportunity to use and enjoy a dwelling.

To show that a requested accommodation may be necessary, there must be an identifiable relationship, or nexus, between the requested accommodation and the individual's disability.

**Example 1:** A housing provider has a policy of providing unassigned parking spaces to residents. A resident with a mobility impairment, who is substantially limited in her ability to walk, requests an assigned accessible parking space close to the entrance to her unit as a reasonable accommodation. There are available parking spaces near the entrance to her unit that are accessible, but those spaces are available to all residents on a first come, first served basis. The provider must make an exception to its policy of not providing assigned parking spaces to accommodate this resident.

**Example 2:** A housing provider has a policy of requiring tenants to come to the rental office in person to pay their rent. A tenant has a mental disability that makes her afraid to leave her unit. Because of her disability, she requests that she be permitted to have a friend mail her rent payment to the rental office as a reasonable accommodation. The provider must make an exception to its payment policy to accommodate this tenant.

**Example 3:** A housing provider has a "no pets" policy. A tenant who is deaf requests that the provider allow him to keep a dog in his unit as a reasonable accommodation. The tenant explains that the dog is an assistance animal that will alert him to several sounds, including knocks at the door, sounding of the smoke detector, the telephone ringing, and cars coming into the driveway. The housing provider must make an exception to its "no pets" policy to accommodate this tenant.

## 7. Are there any instances when a provider can deny a request for a reasonable accommodation without violating the Act?

4

Yes. A housing provider can deny a request for a reasonable accommodation if the request was not made by or on behalf of a person with a disability or if there is no disability-related need for the accommodation. In addition, a request for a reasonable accommodation may be denied if providing the accommodation is not reasonable - *i.e.*, if it would impose an undue financial and administrative burden on the housing provider or it would fundamentally alter the nature of the provider's operations. The determination of undue financial and administrative burden must be made on a case-by-case basis involving various factors, such as the cost of the requested accommodation, the financial resources of the provider, the benefits that the accommodation would provide to the requester, and the availability of alternative accommodations that would effectively meet the requester's disability-related needs.

When a housing provider refuses a requested accommodation because it is not reasonable, the provider should discuss with the requester whether there is an alternative accommodation that would effectively address the requester's disability-related needs without a fundamental alteration to the provider's operations and without imposing an undue financial and administrative burden. If an alternative accommodation would effectively meet the requester's disability-related needs and is reasonable, the provider must grant it. An interactive process in which the housing provider and the requester discuss the requester's disability-related need for the requested accommodation and possible alternative accommodations is helpful to all concerned because it often results in an effective accommodation for the requester that does not pose an undue financial and administrative burden for the provider.

**Example:** As a result of a disability, a tenant is physically unable to open the dumpster placed in the parking lot by his housing provider for trash collection. The tenant requests that the housing provider send a maintenance staff person to his apartment on a daily basis to collect his trash and take it to the dumpster. Because the housing development is a small operation with limited financial resources and the maintenance staff are on site only twice per week, it may be an undue financial and administrative burden for the housing provider to grant the requested daily trash pick-up service. Accordingly, the requested accommodation may not be reasonable. If the housing provider denies the requested accommodation as unreasonable, the housing provider should discuss with the tenant whether reasonable accommodations could be provided to meet the tenant's disability-related needs - for instance, placing an open trash collection can in a location that is readily accessible to the tenant so the tenant can dispose of his own trash and the provider's maintenance staff can then transfer the trash to the dumpster when they are on site. Such an accommodation would not involve a fundamental alteration of the provider's operations and would involve little financial and administrative burden for the provider while accommodating the tenant's disability-related needs.

There may be instances where a provider believes that, while the accommodation requested by an individual is reasonable, there is an alternative accommodation that would be equally effective in meeting the individual's disability-related needs. In such a circumstance, the provider should discuss with the individual if she is willing to accept the alternative accommodation. However, providers should be aware that persons with disabilities typically have the most accurate knowledge about the functional limitations posed by their disability, and an individual is not obligated to accept an alternative accommodation suggested by the provider if she believes it will not meet her needs and her preferred accommodation is reasonable.

**8. What is a "fundamental alteration"?**

5