```
----------------------------------------------------------x
```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
```
----------------------------------------------------------x
```
BARBARA OLSEN, DONALD OLSEN SR.,
DONALD OLSEN  JR., and LONG ISLAND
HOUSING SERVICES, INC.,

                 Plaintiffs,

     -against-


STARK HOMES, INC. D/B/A GLENWOOD
VILLAGE and BRIAN STARK,

              Defendants.
```
----------------------------------------------------------x
```

Civil Action No..
09-4283 (LDW)(ETB)


## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Richard Bellman, Esq (RB0049)
99 Hudson Street, 14th Floor
New York, NY 10013
(212) 739-7576

Erik Heins, Esq. (EH6320)
Long Island Housing Services, Inc.
640 Johnson Avenue, Suite 8
Bohemia, NY 11716
631-567-5111

Attorney for plaintiffs

# TABLE OF CONTENTS

PRELIMINARY STATEMENT...............................................................1

STATEMENT OF THE FACTS..................................................................2

ARGUMENT.......................................................................................6

I. THE DEFENDANTS ENGAGED IN
DISABILITY DISCRIMINATION IN DENYING
RESIDENCY TO DONALD JR...................................................................6

Donald Jr.'s Medical Condition Qualifies as a
Handicap for Purposes of the Fair Housing Act.............................................8

Glenwood Does Not Adhere to a Strict 55 and Older Policy.................................10

The Defendants Elected to Misinterpret the Romano Letter
in an Effort to Justify Excluding Donald Jr. from Glenwood...............................12

II. THE DEFENDANTS VIOLATED THE FHA IN DENYING
THE OLSENS A REASONABLE ACCOMMODATION....................................13

III. PLAINTIFF LIHS HAS ORGANIZATIONAL STANDING........................15

CONCLUSION...................................................................................18

TABLE OF CONTENTS...................................................................ii

TABLE OF CASES.........................................................................iii

STATUTES................................................................................iii

## TABLE OF CASES

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)……………………….......2, 18

Cabrera v. Jakabovitz, 24 F. 3d 372 (2d Cir. 1994)……………….........................15

Eastern Paralyzed Veteras Ass'n v. Lazarus-Burman Assoc.,
133 F.Supp. 2d 203 (E.D.N.Y. 2001)…………………………………………......15, 16

Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982). ………………………..…15

Howard v. City of Beavercreek, 276 F.3d 802 (6th Cir. 2002)……...........................13

Lapid-Laurel, L.L.C. v. Zoning Bd. Of Adjustment of
Tp. of Scotch Plains, 284 F.3d 442 (3rd Dir. 2002)……………………….………..13

Ragin v. Harry Macklowe Real Estate Co.,
6 F.3d. 898 (2d Cir. 1993)……………………………………………………….…15

Shapiro v. Cadman Towers, Inc., 51 F.3d 328 (2d Cir. 1995)………………....…….13

## STATUTES

Fair Housing Act…………………………………………………………….passim

42 U.S.C. 3602 (H)……………………………………………………………..8

42 U.S.C. 3604 (f)……………………………………………………………….7

42 U.S.C. 3604 (f)(3)(B)……………………………………………………….13

```
------------------------------------------------------------x
```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
```
------------------------------------------------------------x
```
BARBARA OLSEN, DONALD OLSEN SR.,
DONALD OLSEN  JR., and LONG ISLAND
HOUSING SERVICES, INC.,

                 Plaintiffs,

    -against-


STARK HOMES, INC. D/B/A GLENWOOD
VILLAGE and BRIAN STARK,

               Defendants.
```
------------------------------------------------------------x
```

Civil Action No..
09-4283 (LDW)(ETB)

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

Plaintiffs Barbara Olsen and Donald Olsen Sr. had contracted to purchase a modular home located in the defendant Glenwood Village, a community purportedly designated for persons 55 years or older.  The contract was with a private owner of the unit and provided the sale was contingent on the Olsens obtaining the approval of the Village with respect to the rental of the lot.  When the Olsens first approached the Village and were shown units the Village had for sale, they had informed the Village agent, Noreen Grossklaus, that they intended to move in with their 42 year old son, plaintiff Donald Olsen Jr., who lives with them because he suffers from the mental disability of major depression.

The Olsens' application to the Village was ultimately rejected by defendant Brian Stark.  Plaintiffs allege that the defendants violated the Fair Housing Act ("FHA") and

the New York State Human Rights Law in that the rejection constitutes discrimination based on Donald Jr.s' disability and because the defendants failed to provide a reasonable accommodation to the Olsens by waiving the purported age restriction with respect to Donald Jr.

The defendants have fashioned their motion for summary judgment by arguing that Donald Jr. is not disabled, that he did not have to live with his parents, and that he was rejected because of the Village's strict policy of requiring all residents being over 55 years of age. Defendants' also falsely assert that plaintiff Long Island Housing Services, Inc. (LIHS) does not have standing to sue. In response to these claims, plaintiffs present facts and law which challenge defendants' contentions and which set forth a strong case in support of plaintiffs' claim of housing discrimination. With respect to the instant motion, when the Court views the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in plaintiffs favor, summary judgment must be denied. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).[1]

## STATEMENT OF THE FACTS

In and about January 2008, Barbara Olsen and Donald Sr. began to look for new housing as they wished to move from the Ridge section of Suffolk County where they had been residing. They decided to sell their Ridge home because Barbara was having trouble navigating the stairs in the house and the home was too large and expensive to

---

[1] The defendants in their motion papers continually refer to criminal charges pending against Donald Olsen Jr. and to the fact that the complaint originally included a claim by Barbara Olsen of disability discrimination against her. Plaintiffs do not respond to these matters. As to the alleged criminal charge against Donald Jr., plaintiffs do not respond as there is nothing in the record concerning this matter and it is irrelevant to the claims presented in this complaint. Plaintiffs do not respond with respect to the Barbara Olsen claim as that claim was withdrawn by stipulation of the parties and the matter is no longer material.

maintain if and when Donald Sr. decided to retire.  Barbara Olsen Decl. ¶ 2, attached to Plaintiffs' Responses to Defendants' Statement Pursuant to Local Rule 56.1, Exh. 1 ("B. Olsen Decl.").

Donald Jr., who at the time of the housing search was 42 years old, had lived with his parents since 2004 when he was released from a hospital in Columbus Ohio where he had been living.  He had been hospitalized after a suicide attempt and he was told it would be dangerous and unacceptable for him to live alone.  His marriage had broken up and his parents' home represented the only residency option available to him.  B. Olsen Decl. ¶¶ 1,3; Donald Olsen Jr. Decl. ¶ 2, attached to Plaintiffs' Responses to Defendants' Statement Pursuant to Local Rule 56.1, Exh. 3 ("Donald Jr. Decl.").

As part of their housing search the Olsens inspected modular units for sale at Glenwood Village, a mobile park community consisting of hundreds of manufactured or modular homes.  The Glenwood Village development is purported to be an age-restricted 55 and older community.

In January 2008, Barbara and Donald Sr. met with Noreen Grossklaus, a sales agent for Glenwood Village.  They informed Ms. Grossklaus that they were interested in a doublewide unit which would be for them and their 42 year old mentally disabled son. At the time, Barbara was 63 years old and Donald Sr. was 65 years old.   They were shown some units by Ms. Grossklaus and some by a private real estate agent, Patricia Pidgeon of Little Bay Realty.   Ms. Pidgeon was also informed of Donald Jr.'s age, disability and his need to live with his parents.  B. Olsen Decl. ¶ 5.

On or about January 19, 2008, Barbara and Donald Sr. entered into a sales agreement to purchase a mobile unit situated on a lot at Glenwood from its owner, John

Martin.  The agreement provided for an all cash transaction with a purchase price of $145,000.  The agreement stated that the closing was to take place on or about March 1, 2008 and that the purchase was contingent on "Park Approval."   A copy of this agreement is attached to Defendants 56.1 Statement, Exh. D.

The Olsens completed and submitted a Glenwood Village application for rental of the lot housing the Martin unit.  Defendants' 56.1 Statement, Exh. J.  The defendants argue that the Olsens were somehow deceitful as they did not list Donald Jr. on the application.  There was, however, no space on the application designated for additional residents, only two lines; one for a purchaser and one for the purchaser's husband or wife.  It did not occur to the Olsens to list Donald Jr. as he was not going to be a purchaser.  Contrary to defendant Stark's claim, the Olsens had no intention of hiding the fact that Donald Jr. would be living with them.  They had informed Ms. Grossklaus of their intention in that regard, a fact Grossklaus acknowledges in her affidavit.  B. Olsen Decl. ¶ 8;  Grossklaus affidavit in Support of Defs' Motion, at ¶ 4.[2]

After filing the application, Barbara Olsen was contacted by defendant Stark who inquired about Donald Jr.'s disability.  Ms. Olsen told Stark that Donald Jr. was 42 years old, that he was disabled due to a mental illness, and that he needed to live with her husband and her as he was suffering from major depression.  She also told Stark that he attended a day program and that he saw a therapist each week.  B. Olsen Decl. ¶ 9.

During this conversation it came up that the Olsens have gone on vacations without Donald Jr.  Defendant Stark then asked if Donald Jr. was able to stay in the house alone without causing trouble.  Barbara Olsen responded that he was able to stay alone

---

[2] Defendants continue to argue that they were not informed until after the application was submitted that Donald Jr. was to reside his parents.  Plaintiffs' version of what transpired, however, is to be accepted for purposes of this motion.

without any difficulties for brief periods of time.  Stark then requested that the Olsens provide a letter from Donald Jr.'s psychiatrist stating that Donald Jr. would be able to live by himself if his parents were away from home for short periods and that he would not put any other residents at Glenwood in danger at such times.  B. Olsen Decl. ¶ 10.

In response to Stark's request, the Olsens provided Stark with a letter dated January 31, 2008 from Dr. Jeffrey P. Romano, a clinical psychologist working with Donald Jr. at the Opti-HealthCare DTC an outpatient mental health facility located in Riverhead N.Y.  Dr. Romano confirmed that Donald Jr. had been diagnosed with Major Depression and was disabled.  He continued, "I understand that you have concerns regarding Mr. Olsen's ability to live on his own at Glenwood.  Although he is disabled, he qualifies for independent living."  Defendants 56.1 Statement, Exh. M.

Following submission of the Romano letter, Stark sent Barbara a letter dated February 5, 2008, in which he advised that Glenwood was denying the request for residency for Donald Jr., purportedly because Donald Jr. was not 55 or older.  Defendants' 56.1 Statement, Exh. N.  Stark referred to Glenwood's purported policy that all residents must be 55 or older to reside in Glenwood unless the under age resident is necessary for the physical care or economic support of the senior resident.  The letter also stated that management reserved "the right to reject any resident who does not qualify under the community's age restriction."

Shortly after receiving this rejection letter, Barbara Olsen telephoned Stark and asked him to reconsider his decision and to meet with her and Donald Jr.  Stark stated that he had made up his mind and he would not change his decision.   Stark stated that Barbara and her husband could move to Glenwood but Donald Jr. could not.  Stark then

stated that he did not need "that kind of trouble" and he had the right to pick and choose whomever he wanted in his Park. B. Olsen Decl. ¶ 13.

On or about February 27, 2008 Donald Jr. contacted LIHS and requested its assistance with respect to what the Olsens perceived to be discrimination based on Donald Jr.'s disability. LIHS is the principal fair housing advocacy and counseling organization on Long Island. LIHS representatives agreed to assist the Olsens in an effort to reverse Stark's rejection of the Olsen application to live at Glenwood. B. Olsen Decl. ¶ 15.

On March 4, 2008, Marian Reid, LIHS's Senior Fair Housing Investigator, wrote Stark and asked him to allow the Olsens to purchase the modular unit in question and move into the Park with Donald, Jr. Defendants 56.1 Statement, Exh. O. Ms. Reid wrote that this request was based on the need for a reasonable accommodation because of Donald Jr.'s disability and cited the related Fair Housing obligations, providing Stark with a copy of the HUD-DOJ Joint Statement on Reasonable Accommodation to help inform his decision. Stark did not respond to this letter. When Ms. Reid wrote to Stark, the Martin unit was still available for purchase and the Olsen family were still interested in living at Glenwood. B. Olsen Decl. ¶ 16.

## ARGUMENT

### I

### THE DEFENDANTS ENGAGED IN DISABILITY DISCRIMINATION IN DENYING RESIDENCY TO DONALD JR.

The FHA provides that it is unlawful to "discriminate in the sale or rental, or otherwise make unavailable or deny, a dwelling to any buyer or renter because of a

6

handicap of . . . a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or … any person associated with that buyer or renter." 42 U.S.C. 3604(f).  Plaintiffs maintain that the evidence as developed presents a strong case that Donald Jr. was excluded from residency in Glenwood because of his mental disability in violation of the prohibition on handicap discrimination as set forth in the FHA.  This showing certainly warrants denial of summary judgment.

Plaintiffs have presented evidence that defendant Stark was vitally concerned because of Donald Jr.'s mental disability when considering the request that he be granted residency at Glenwood Village.  He called Barbara Olsen in January 2008 to question her about her son's mental condition and specifically inquired if it was safe for the Olsens to leave Donald Jr. alone should they have to be away from home for short periods of time. Stark was not prepared to accept Barbara's assurance in this regard and instead asked for a letter from Donald's psychiatrist stating that Donald Jr. could stay alone at Glenwood without a problem.  B. Olsen Decl. ¶ 10.

The Romano note was turned over to Stark who then elected to misinterpret it to conclude that Donald Jr. could live alone all the time and he did not have to come to Glenwood.  Stark sent a rejection letter to Barbara stating that he was excluding Donald Jr. based on Glenwood's allegedly strict practice of limiting residency to those 55 and older, except with respect to care givers.  Defendants' 56.1 Statement, Exh. N.

Upon receipt of the rejection letter, Barbara called Stark to seek his reconsideration of his decision to exclude Donald Jr.  Barbara asked Stark to meet with Donald, Jr.  Stark told Barbara that he had made his decision and he had no interest in meeting Donald Jr.  He then articulated the real reason for Donald Jr.'s exclusion; he told

Barbara that he did not need "that kind of trouble" and he had the right to pick and choose whomever he wanted in his Park. In making this statement, Stark was in effect predicting that trouble would arise from housing Donald Jr. because he previously had experienced trouble from a resident who was mentally disabled. Stark told this to LIHS' tester Wendy Warren when she had sought tenancy for herself and her mentally disabled 40-year-old daughter as part of a test. Stark advised Warren that he had to proceed cautiously with respect to Warren's daughter as he had had an incident with a resident who was running around the complex naked.

### Donald Jr.'s Medical Condition Qualifies as a Handicap for Purposes of the Fair Housing Act

The term "Handicap" as used in the FHA is defined as "a physical or mental impairment which substantially limits one or more of such person's major life activities." 42 U.S.C. 3602(H). There is no doubt but that Donald Jr.'s mental disability qualifies under this definition. Dr. Romano in his note states that Donald "is diagnosed with Major Depression, a condition he has had for many years." Donald states in his Declaration he became aware of his condition in 2002. In his Declaration he presents the history of his condition.

Thus, in 2003 and 2004 Donald was hospitalized in Columbus, Ohio where he was living at the time, for major depression and suicidal tendencies. His last hospitalization in Columbus was in May 2004 when he was admitted for severe depression and a threat of suicide. At that time his wife left him and he had no place to live. Upon his discharge from the hospital in June 2004, he was told by his doctors that it would be dangerous and unacceptable for Donald to live alone. He states that the only option open to him at that time was to move in with his parents in New York. He has

continued to live with his parents ever since.

Donald reports he continues to suffer from bouts of severe depression and anxiety and he has periodic thoughts of suicide.  When these incidents occur, Donald tends to isolate himself.  It is therefore necessary for Donald to live with others who can monitor his mood swings and serve as a support group when he is facing periods of severe depression or anxiety.  He was hospitalized again in October 2007 at the Pilgrim Psychiatric Center for depression and thoughts of suicide.

It is necessary for Donald to be medicated on a daily basis.  He takes 200 milligrams of sertraline, a drug which is designed to stabilize his mood swings; 100 milligrams of vistaril which is to control for anxiety; and 200 milligrams of lamictal which is also a mood stabilizer.

Donald states that because of his mental health condition, particularly his states of anxiety, it is impossible for him to hold a job.  The defendants claim that Donald was working when he was advocating for mental health in Albany.  This, however, was on a volunteer basis without pay and was part of his program at the Synergy Center, a mental health facility located in Riverhead, NY.[3]  As a result of his inability to work, his sole source of income is from Social Security Disability, which he has been receiving since November 2004.

On a daily basis Donald goes to the Synergy Center where he attends support groups and receives counseling.  He meets with Dr. Romano once a week.  He has been seeing Dr. Romano since October 2006.  He also sees his psychiatrist, Dr. Michael

_____

[3] Donald did get a paying job in September 2010 lobbying on health issues.  However, he found the job was too stressful and anxiety producing and he was forced to give it up in January 2011.

_____.

Manella, on a monthly basis.  Dr. Manella monitors his medications.

Donald summarizes his condition in his Declaration as follows: "My continuing state of major depression prevents me from living a normal life.  My divorce was a direct result of my depression and suicide attempts.  My mental condition prevents me from taking employment and instead, I spend my days at a mental health clinic.  I must take strong medications daily.  My condition also prevents me from living independently and, as a result, I continue to reside in my parents' home.  My parents serve as essential support system for me."  This clearly fits the definition of a handicap recognized by the FHA.

### Glenwood Does Not Adhere to a Strict 55 and Older Policy

Stark's claim that Glenwood adheres to a strict 55 and older residency policy and it was because of that policy that residency was denied to Donald Jr., is unsupportable and in fact his claim further supports plaintiffs' charge of disability discrimination.  The evidence establishes that contrary to Stark's contention Glenwood does not follow a "strict" practice and was under no legal or policy mandate to exclude Donald Jr. based on age.

The falsity of Stark's claim was clearly established by the testing undertaken by LIHS.  LIHS sent three testers to Glenwood posing as persons interested in residing there.  These tests were designed to determine whether the defendants in fact adhere to a strict requirement that residents of the Park be 55 or older.  Pls. Ex. 9, Reid Decl. ¶ 5.  The first test was conducted March 25, 2008, by Rita Simonetti.  She reported that Stark undertook to show her available units.  As they left Stark's office and approached the first unit, Simonetti told Stark that she was turning 55 in May and that her sister, who was going to

10

be living with her, was only 49.  Simonetti asked if this would be a problem.  Stark

responded that their ages would not be a problem.  He said that they just do not want kids

or babies because it is an adult community.  (Pls. Ex. 6, Simonetti Decl. ¶ 4).

On March 28, 2008, LIHS tester Karen Shuker visited Glenwood to conduct a site

test.  Ms. Shuker met with Stark, who showed her around the complex for approximately

45 minutes.  During this visit, Shuker told Stark that she was about to turn 53 years old,

and was looking to purchase that May, as a birthday gift to herself.  Defendant Stark

never made any mention of the age restriction or her need to wait until she was 55 years

old to apply.  (Pls. Ex. 8, Karen Shuker Decl., ¶¶ 1-4).

On July 30, 2008, LIHS tester Wendy Warren visited Glenwood and portrayed

herself as a single woman with a 40 year old mentally disabled daughter.  (Pls. Ex. 7,

Wendy Warren Dep. pp. 10-11).  Ms. Warren expressed interest in purchasing a unit for

herself and her daughter (Warren Dep., p. 13).   Stark stated that he needed to meet the

daughter before he could make a decision about whether they would be allowed to move

in.  Stark stated he had to be cautious because he had had an incident with a mentally

disabled male resident who was running around the Park naked.  (Warren Dep., p. 16).

Stark testified that Glenwood is operated according to the 80/20 rule that requires

that at least 80 percent of the development's units be occupied by at least one person over

the age of 55.  Qualifying as a 55 and older development exempts the owner from

familial status discrimination (discrimination against children 18 years and younger).

Under this rule, 20 percent of the units could be for persons under the age of 55.  (Stark

Dep. p. 14).  Since Barbara Olsen and Donald Sr. are over 55, Donald Jr. living with

them would not have affected the 20 percent limitation or Glenwood's 80/20 balance.

Thus, there was no legal impediment to Donald Jr. living at Glenwood.  See 42 U.S.C. 3607(b)C)(i).

Furthermore, defendant Stark testified that he has at least two current residents, Jonathan and Robert Cioffi, who are under 55 years of age.  The Cioffis' residency does not conform to Stark's claimed strict 55 age policy as they are not essential to the physical care or economic support of the senior resident. (Stark Dep. pp. 15-17).  Donald Jr. states that he knows Jonathan Cioffi through Synergy Center's mental health program, where they are both participants.  Donald Jr. Decl. ¶ 16.

### The Defendants Elected to Misinterpret the Romano Letter in an Effort to Justify Excluding Donald Jr. from Glenwood

In denying residency to Donald Jr., defendant Stark chose to misinterpret the Romano letter as advising that Donald Jr. is able to live by himself independently from his parents at all times, not just for limited periods during the family's residency at Glenwood.  In so doing, Stark ignored the fact that he had requested this note from Donald's doctor in order to address Stark's concern as to whether Donald could stay alone for short periods at Glenwood and that the Romano letter specifically response to this concern and goes on to pointedly reference residency at Glenwood.  Stark glommed onto this letter and used it to deny Donald Jr. the right to live at Glenwood with his parents without ever attempting to get clarification of Romano's position.  Furthermore, Stark did not mention in the rejection letter to Barbara Olsen, or during his conversation with her, that he read the Romano letter as providing that Donald Jr. did not have to live with his parents because he was not disabled.  Stark's silence was clearly to avoid the Olsens obtaining another letter from Romano clarifying the Donald had to reside with his parents due to his mental disability.

12

This all confirms that defendant Stark did not reject Donald Jr. based on his age, but rather because of his mental disability. He admitted as much to Barbara Olsen when he said he did not need this kind of trouble at Glenwood, referring to Donald Jr. Apparently, defendant Stark had in mind the troubling incident with a mentally challenged resident who was seen running around the Park naked. See Exh. 7, Warren Dep. p. 16. The misguided belief that Donald Jr. was not disabled and did not need to live with his parents cannot reasonably have been reached by Stark from the information available to him and the context by which that information was attained. Stark's rejection can thus only be reasonably understood as motivated by discriminatory animus.

## II

### THE DEFENDANTS VIOLATED THE FHA IN DENYING THE OLSENS A REASONABLE ACCOMMODATION

The FHA provides that "reasonable accommodations" must be made in "rules, policies, practices, or services, when such accommodations may be necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling." 42 U.S.C. 3604(f)(3)(B). This means that a housing provider must make feasible, practical accommodations in its rules unless the requested accommodation imposes an undue financial or administrative burden on a defendant or requires a fundamental alteration in the nature of its program. See e.g., Lapid-Laurel, L.L.C. v. Zoning Bd. Of Adjustment of Tp. of Scotch Plains, 284 F.3d 442, 462 (3rd Dir. 2002); Howard v. City of Beavercreek, 276 F.3d 802, 806 (6th Cir. 2002); Shapiro v. Cadman Towers, Inc., 51 F.3d 328, 332 (2d Cir. 1995).

The accommodation the Olsens requested was for the defendants to exempt Donald Jr. from their purported rule that only persons 55 and older were permitted to

reside in Glenwood, except for care providers of senior residents. This accommodation was necessary in order for the Olsens to have an equal opportunity to live in Glenwood; the Olsens could not relocate to Glenwood as long as Donald Jr. was excluded pursuant to the age restriction.

The requested accommodation would not have imposed any financial or administrative burden on the defendants. Nor would it require a fundamental alteration of Glenwood's program. The testing evidence establishes that Glenwood is flexible in terms of its enforcement of the purported policy. Also, defendant Stark testified that Glenwood operates pursuant to the 80/20 rule so that inclusion of Donald Jr. would not alter the number of under 55 year olds that could live at Glenwood. Moreover, Stark admitted there are currently residents at Glenwood who are under 55 years of age who are not care givers. Finally, there are untold numbers of under 55 year old care givers who are residents so that one more male adult, who at the time was 42, would not in any way compromise the adult nature of the community. In this regard, Stark told tester Simonetti that her 49 year old sister would not be a problem as his concern was only to avoid kids and babies.

The Olsens made their needed accommodation request clear upon first discussing Donald Jr.'s occupancy with defendants, and their request was reiterated after Stark's rejection when LIHS employee Marian D. Reid wrote to Stark. In both instances, Stark improperly denied the accommodation, and refused to engage in an interactive process that would have allowed the parties to reach a resolution. See HUD-DOJ Joint Statement on Reasonable Accommodation, ¶7, relevant portion attached as Exh.10. In failing to do so, the defendants clearly violate the FHA in refusing to grant the reasonable

accommodation requested by the Olsens.

### III

### PLAINTIFF LIHS HAS ORGANIZATIONAL STANDING

It is defendants' contention that plaintiff LIHS does not have standing to bring its own claims before the court. Defendants admit that an organization has standing to sue in its own right if "it alleges such a personal stake in the outcome of the controversy that federal-court jurisdiction is warranted." Eastern Paralyzed Veteras Ass'n v. Lazarus-Burman Assoc., 133 F.Supp. 2d 203, 210-211 (E.D.N.Y. 2001) ("EPVA").

Defendants ignore the broad and well-established background upon which organizational standing has been found in Fair Housing Act (FHA) claims. The Supreme Court established that fair housing organizations, such as LIHS, have standing to bring claims under the FHA. Havens Realty Corp. v. Coleman, 455 U.S. 363, 378-79 (1982). When an organization suffers an identifiable drain on its resources, it has suffered an injury that is sufficiently concrete and demonstrable and is "more than simply a setback to the organization's abstract social interests." Id. at 379. Such an injury gives rise to organizational standing. Id.

This standard has been followed repeatedly in the Second Circuit. In Ragin v. Harry Macklowe Real Estate Co., 6 F.3d. 898, 904-905 (2d Cir. 1993), the Circuit court affirmed a Fair Housing organizations standing after its staff spent time identifying and remedying the discriminatory conduct of the defendant. Likewise, in Cabrera v. Jakabovitz, 24 F. 3d 372, 379 (2d Cir. 1994), a fair housing organization was found to have standing when it conducted an investigation into the unlawful discriminatory conduct of a defendant that included the use of testing evidence. Even the EPVA case,

15

which defendants rely on, found that the plaintiff fair housing organization, the same plaintiff here, LIHS, had standing based on the diversion of resources that resulted from its investigation into unlawful housing practices. See EPVA at 212.

Here, plaintiff LIHS engaged in a lengthy investigation of defendants' housing practices. This investigation resulted in the diversion of resources from its normal activities of providing counseling, education and assistance to individuals in seeking affordable housing free from discrimination. The investigation revealed that the defendants engaged in a practice of discriminating based on disability, and offered strict adherence to an age policy as a pre-textual reason for that discrimination. Reid decl. ¶6. In addition, plaintiff LIHS' mission includes making available affordable housing free from discrimination on Long Island. This mission is frustrated by defendants' discriminatory conduct. LIHS will have to expend resources to counteract the effect the discrimination will have on the community, which will include costs associated with monitoring, education and outreach, and additional counseling services. These particular and quantifiable harms are exactly the damages that give rise to standing for an organization, and are an injury for which LIHS can seek redress in Federal court.

Defendants assert that LIHS is responsible for its own diversion of resources because it undertook an investigation of defendants without verifying the veracity of the Olsens' claims. Defs. Memorandum of Law, p. 8. However, this standard has no basis in either law or fact. The reason for which LIHS undertook its investigation is irrelevant to whether that investigation confers standing upon the organization.

Moreover, even if defendants' position, unsupported by any existing case law, were granted, the facts herein demonstrate that the claims brought to LIHS by the Olsens

were credible and provided a legitimate reason to undertake an investigation of
defendants' housing practices.  Contrary to defendants' claims, LIHS undertook its
investigation because there was an allegation of discrimination occurring in the
community that needed to be uncovered and remedied.

Once underway, the investigation constituted a significant diversion of resources
for plaintiff LIHS.  Defendants attempt to discredit the investigation by relying on
statements from the individual testers.  However, defendants misrepresent the findings by
these testers by taking quotations out of context.  Although Warren did testify that she
"did not remember" if she asked if there was anyone at Glenwood under 55, she was
clear in her deposition that defendant Stark was aware she would be seeking to move in
with a mentally disabled daughter, and that before he could approve that he wanted to
meet with her daughter.  Warren was also clear that Stark mentioned he had an incident
with another mentally disabled resident that ran around naked.  Warren Dep. pp. 12-16.
Likewise, defendants insist that Warren had "no reason to believe she could not live [at
Glenwood] with her daughter", but this quotation is also taken out of context.  The
entirety of her deposition shows that Warren was never informed whether she could or
could not live at Glenwood with her daughter.  Warren was only informed that defendant
Stark would have to meet her daughter before he could make that determination.  Warren
Dep. pp. 12-16, 41.

Defendant also attempts to discredit tester Shuker's testing evidence through
claims that defendants were not aware that she planned to move in prior to attaining the
age of 55.  However, this is not true.  Shuker met with Stark in March of 2008, and
clearly explained that she was turning 53 years old in May of that year and would be

17

seeking to purchase a unit as a birthday gift for herself.  Shuker Decl. ¶ 4.

Defendants ignore the fact that testers are sent with the purpose of gathering information, but are not asked to draw conclusions as to whether discrimination occurred. The testing coordinator reviews the information at the conclusion of the test and analyzes the information to determine whether the practices in question are discriminatory.   Reid Decl. ¶5.  Defendants misrepresent the record by arguing that the investigation conducted proved nothing.  The facts provided herein, as well as the testing conducted by LIHS, show that defendants do not adhere to a strict age policy, and instead use that policy as a pretext for denying applicants with mental disability.  Reid Decl. ¶6.

Despite the defendants' contentions, the fact scenario presented by the plaintiffs is supported by the record.  At this point in the proceeding, when the facts are viewed in the light most favorable to plaintiffs, it is clear that summary judgment would be improper. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Plaintiff LIHS has diverted significant resources to engage in a proper investigation of defendants housing practices with the goal of uncovering and remedying discrimination in the community.  Long established case law confers organizational standing upon plaintiff LIHS to seek damages for its diverted resources and for its frustrated mission, and thus it is proper to find LIHS has standing to present its claims.

## CONCLUSION

Base on the foregoing, the plaintiffs respectfully request that the Court deny

defendants' Motion for Summary Judgment and grant such other and further relief as the

Court may deem just and proper.


Dated:  Bohemia, New York
        March 23, 2011


                                        Respectfully submitted,



                              By:   _Richard J Bellman_____
                                    Richard Bellman, Esq (RB0049)
                                    Attorney for Plaintiffs
                                    99 Hudson Street, 14th Floor
                                    New York, NY 10013
                                    (212) 730-7576
                                    rbellman@latinojustice.org


                                    _Erik Heins_____
                                    Erik Heins, Esq. (EH6320)
                                    Attorney for plaintiffs
                                    Long Island Housing Services, Inc.
                                    640 Johnson Avenue, Suite 8
                                    Bohemia, NY 11716
                                    631-567-5111
                                    erik@lifairhousing.org


To:    John L. Ciarelli, Esq. (JC0689)
       Ciarelli & Dempsey, P.C.
       Attorney for Defendants
       737 Roanoke Ave.
       Riverhead, New York 11901
       631-369-5100
       CiarelliDempsey@optonline.net