# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

**MANDATE**

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 18th day of July, two thousand and fourteen.

Before:     Amalya L. Kearse,
            Dennis Jacobs,
            Barrington D. Parker,
                *Circuit Judges.*

_____

Barbara Olsen, Donald Olsen Sr., Donald Olsen Jr., and Long Island Housing Services, Inc.,

    Plaintiffs-Appellants,

                                       **JUDGMENT**
                                       Docket No. 13-247

v.

Stark Homes, Inc. d/b/a Glenwood Village and Brian Stark,

    Defendants-Appellees,

_____

      The appeal in the above captioned case from a judgment of the United States District Court for the Eastern District of New York was argued on the district court record and the parties' briefs.  Upon consideration thereof,

      IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgment of the district court is VACATED and the matter is REMANDED for trial in accordance with the opinion of this court.

                                  For The Court:

                                  Catherine O'Hagan Wolfe,
                                  Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

MANDATE ISSUED ON 08/08/2014

13-0247
Olsen v. Stark Homes, Inc.

1    UNITED STATES COURT OF APPEALS

2    FOR THE SECOND CIRCUIT

3    - - - - - -

4    August Term, 2013

5    (Argued:  November 20, 2013                              Decided: July 18, 2014)

6    Docket No. 13-0247

7    _____

8    BARBARA OLSEN, DONALD OLSEN SR., DONALD OLSEN JR., and LONG
9    ISLAND HOUSING SERVICES, INC.,

10   Plaintiffs-Appellants,

11   - v. -

12   STARK HOMES, INC. d/b/a Glenwood Village and BRIAN STARK,
13   Defendants-Appellees.[*]
14   _____

15   Before:  KEARSE, JACOBS, and B.D. PARKER, Circuit Judges.

16          Appeal from a judgment of the United States District Court for the Eastern District of

17   New York, Leonard D. Wexler, Judge, dismissing as a matter of law claims that defendants,

18   rejecting the Olsen plaintiffs' attempt to acquire housing, discriminated against them on the basis of

19   handicap or disability, in violation of the Fair Housing Act, 42 U.S.C. § 3601 et seq., and the New

20   York State Human Rights Law, N.Y. Exec. Law § 290 et seq.

---

[*]    The Clerk of Court is directed to amend the official caption to conform with the above.

1                        Vacated and remanded.

2                                 STEPHEN M. DANE, Washington, D.C. (Thomas J. Keary,
3                                 Relman, Dane & Colfax, Washington, D.C. <u>on the brief</u>, <u>for</u>
4                                 <u>Plaintiffs-Appellants Barbara Olsen,  Donald Olsen Sr., and</u>
5                                 <u>Donald Olsen Jr.</u>

6                                 ERIK HEINS, Staff Attorney, Long Island Housing Services,
7                                 Inc., Bohemia, New York, <u>for Plaintiff-Appellant Long Island</u>
8                                 <u>Housing Services, Inc.</u>

9                                 JOHN L. CIARELLI, Riverhead, New York (Ciarelli &
10                                 Dempsey, Riverhead, New York), <u>for Defendants-Appellees</u>.

11    KEARSE, <u>Circuit Judge</u>:

12             Plaintiffs Barbara Olsen ("Barbara"), Donald Olsen Sr. ("Donald Sr."), Donald Olsen

13 Jr. ("Donald Jr." or "Donald"), (collectively "the Olsens"), and Long Island Housing Services, Inc.

14 ("LIHS"), appeal from a judgment of the United States District Court for the Eastern District of New

15 York, Leonard D. Wexler, <u>Judge</u>, dismissing their claims against defendants Stark Homes, Inc. ("Stark

16 Homes"), doing business as Glenwood Village (or "Glenwood"), and Brian Stark (or "Stark"), alleging

17 denial of the application of Barbara and Donald Sr. for a lease at Glenwood because of the handicap

18 or disability (terms used relatively interchangeably by the parties and the courts) of their son Donald

19 Jr., and denial of reasonable accommodation for his condition, in violation of the Fair Housing Act

20 ("FHA"), 42 U.S.C. § 3604(f) (prohibiting discrimination because of "handicap"), and the New York

21 State Human Rights Law ("HRL"), N.Y. Exec. Law §§ 296(5) and (18)(2) (prohibiting discrimination

22 because of "disability").  Following the close of the evidence at trial, the district court granted

23 defendants' motion pursuant to Fed. R. Civ. P. 50(a) for judgment as a matter of law dismissing all

24 of plaintiffs' claims, ruling that there was no evidence that defendants' rejection of the Olsens'

25 application was caused by, or based on, prohibited discrimination.  On appeal, plaintiffs contend

1    principally that the district court erred in dismissing their claims as a matter of law, and that it should

2    instead have granted judgment as a matter of law in favor of plaintiffs on their reasonable

3    accommodation claim.  While we are not persuaded that plaintiffs were entitled to judgment as a

4    matter of law on their reasonable accommodation claim, we conclude that none of plaintiffs' claims

5    should have been dismissed as a matter of law.  Accordingly, we vacate the judgment and remand for

6    trial.

## I. BACKGROUND

7

8    The broad outlines of the present controversy are not in dispute.  Brian Stark is vice

9    president of Stark Homes, which owns Glenwood Village.  Glenwood is a private residential area for

10    approximately 520 mobile homes owned primarily by residents who are at least 55 years of age.  The

11    residents lease space from Stark Homes, pursuant to a lease agreement that states, inter alia, that "[a]ll

12    residents must have attained the age of 55 to reside in Glenwood Village.  Management reserves the

13    right to reject any resident who does not qualify under [this] age restriction."  (Glenwood Village

14    Residency Agreement ("Lease") at 1.)  However, the Lease also states that residents under the age of

15    55 are permitted "if it is established to the satisfaction of the Community's management that the

16    presence of such persons is essential to the physical care of [sic] economic support of the Resident."

17    (Id. at 4.)

18    In January 2008, Barbara and Donald Sr., who were then over the age of 60, entered

19    into a contract to buy a mobile home from one of Glenwood's residents, and they applied to Stark

20    Homes for a lease.  However, Barbara and Donald Sr. stated that they needed to have their son Donald

1    Jr., who was then 42 years of age, live with them because he had been diagnosed with major

2    depression and could not live on his own.  Barbara and Donald Sr. (the "senior Olsens") were

3    approved for a lease at Glenwood Village, but their application to have Donald Jr. live with them was

4    rejected.

5         Barbara tried, unsuccessfully, to get Stark to reconsider the decision and to

6    accommodate their request to have Donald Jr. live with them.  The Olsens contacted LIHS, a private

7    not-for-profit corporation engaged in fair-housing advocacy, which wrote to Stark Homes on the

8    Olsens' behalf.  LIHS also investigated by sending "testers" to Stark Homes to explore the firm's

9    practices with respect to residency by family members under the age of 55 who were handicapped or

10   disabled. After completion of the testing investigation, LIHS drafted and submitted to the Department

11   of Housing and Urban Development ("HUD") administrative complaints on behalf of LIHS and the

12   Olsens, and pursued those complaints before the New York State Division of Human Rights, to which

13   the complaints were referred by HUD.  (See Trial Transcript ("Tr.") 206-08.)

14        In 2009, having failed to persuade Stark Homes to approve the application with Donald

15   Jr. as a resident, plaintiffs commenced the present action alleging, to the extent pertinent to this

16   appeal, that defendants' rejection of the Olsens' application to lease space for a mobile home at

17   Glenwood because of Donald Jr.'s handicap or disability, and defendants' refusal to provide a

18   reasonable accommodation for his condition, violated the FHA and the HRL.  The Olsens sought

19   declaratory and injunctive relief and damages.  In addition, LIHS sought reimbursement for the

20   expenses it had incurred in its work on behalf of the Olsens.

21        The district court conducted a trial for several days in 2012; but after the close of the

22   evidence, the court dismissed the action as a matter of law, without submitting the case to the jury.

1     The trial evidence as to the pertinent details of the above events included the following.

2     A.   Events Leading to the Rejection of the Olsens' Application

3                     In January 2008, hoping to buy a mobile home in which the Olsens would live, Barbara

4     visited Glenwood Village and met with Glenwood's sales and property manager, Noreen Grossklaus

5     ("Grossklaus" or "Noreen").  Barbara testified that, from "the beginning," she told Grossklaus that

6     Donald Jr. was to live with Barbara and Donald Sr, and that "Noreen . . . said that there shouldn't be

7     a problem." (Tr. 100-01.)  Grossklaus testified that when she met with Barbara "prior to her filling

8     out the application" for a Glenwood lease, Barbara "mentioned that there would be a possibility that

9     her son may be moving in with them" (id. at 266); Grossklaus told Barbara the Olsens would need

10    approval from Stark (see, e.g., id. at 267).

11                    After Barbara and Donald Sr. revisited Glenwood with a realtor and found a mobile

12    home they wanted to buy, they entered into a contract with the owner, subject to approval by Stark

13    Homes for a lease.  On January 21, Barbara and Donald Sr. went to the Glenwood office to fill out

14    their lease application.  Donald Sr. testified that

15                         [w]hen we got in there and sat down and filled out the application, I informed
16                         Noreen that my son was--had a mental disability and that he would have to live
17                         with us.  He cannot live independently.

18    (Tr. 58.)  Donald Sr. testified that Donald Jr. attended therapy sessions almost every day, had been

19    hospitalized multiple times, and had made multiple attempts to commit suicide.  (See id. at 46, 48.)

20    However, Donald Sr. did not give Grossklaus these details as to Donald Jr.'s disability because he

21    wanted to avoid embarrassment.  (See id. at 46.)

22                    Donald Sr. testified that in filling out the lease application, he did not list Donald Jr.

- 5 -

1    as a resident but he "mentioned it to Noreen again, stating that our son was mentally disabled and he

2    had to live with us.  He cannot live on his own."  (Id. at 60.)  Barbara testified that they asked

3    Grossklaus whether they should list Donald Jr.'s name in the application, "[a]nd she said no, you don't

4    need to" (id. at 101), but that approval would be needed from Stark (see id. at 102).

5           Barbara thereafter received a telephone call from Stark "ask[ing] me about my son and

6    why he had to live with us." (Tr. 82.)  She testified:

7           I told him because he had mental illness and he cannot live alone monetarily.

8                    Q.  Did he ask anything else of you. Mrs. [Olsen]?

9                    A.  Yes.  He asked me if I could get a letter from Donald's doctor
10           stating his disability and what it was and if he could be left alone for a short
11           period of time.

12   (Id. at 82-83.)

13          Donald Jr.'s treating psychologist was Dr. Jeffrey Romano.  Donald Jr. testified: "My

14   mother told me that Mr. Stark had called and he requested a letter from Dr. Romano stating my

15   disability and if I could be left alone for a certain period of time while they're on vacation."

16   (Tr. 124-25.)  Donald Jr. requested such a letter:  "I asked Dr. Romano to address what my disability

17   was and if I could be left alone for a short period of time while my parents were on vacation."  (Id.

18   at 125.)  On January 31, Donald Jr. hand-delivered to the Stark Homes office a one-page letter from

19   Dr. Romano that stated as follows:

20                 I am writing on behalf of Mr. Donald Olsen, Jr.  I see Mr. Olsen at
21           Opti-HealthCare Diagnostic and Treatment Center, here in Riverhead.  Mr.
22           Olsen is diagnosed with Major Depression, a condition he has had for many
23           years.  I understand that you have concerns regarding Mr. Olsen's ability to
24           live on his own at Glenwood.  Although he is disabled, he qualifies for
25           independent living.  Mr. Olsen serves as a System Mental Health Advocate
26           through Synergy Center . . . .  In this role, Mr. Olsen works closely with NYS
27           Legislators in Albany, advocating for individuals with mental illness.

1    It is my clinical opinion that Mr. Olsen's ability to live independently
2    is without question.  I will reconsider [sic] your stance in this matter.

3    (Letter from Dr. Jeffrey P. Romano to To Whom It May Concern dated January 31, 2008 ("Romano

4    Letter" or "January 2008 Letter").)  Although Dr. Romano gave explanations at trial for some of the

5    terms used in this letter (see Part I.C. below), the letter was his sole communication with defendants

6    about Donald Jr. prior to their denial of the request to allow Donald Jr. to live with his parents at

7    Glenwood (see Tr. 177).

8    Stark testified that Barbara and Donald Sr. "were approved on their own" if Donald

9    Jr. was not going to live with them.  (Id. at 296.)  Barbara had asked him "to consider her son as a

10   disabled person and to relax the rules because of his disability" (id. at 283); Stark recalled that

11   Barbara "may have" told him "that Donald's disability was depression" and was "seeking to have

12   Donald as a resident in the home" (id. at 284-85); but he otherwise did not remember any details she

13   may have given him (see id. at 283-84.  At trial, Stark testified that he "asked for a doctor's note to

14   substantiate the consistency with [the Stark Homes] lease" (id. at 280), and he rejected the request for

15   an exception because Donald Jr. was not qualified under the terms of the Lease (see id. at 281).  His

16   testimony included the following:

17   Q.  Question [from Stark's deposition]:

18   Isn't it a fact that the doctor's note you asked for was to address whether
19   he was able to be left alone or not?

20   And do you recall your answer?

21   The doctor's note that I asked for was evidence of his disability.
22   Period.

23   You didn't say anything else after that, did you?

24   A.  If that's what I said in my deposition, that's accurate.

1    Q.  Okay.  Now, you eventually received the letter from Dr. Romano.
2    Correct?

3    A.  Yes.

4    . . . .

5    Q.  After reviewing that letter, did you conclude, did you make a
6    decision about whether Donald was disabled?

7    A.  No.  The key word being he qualifies for independent living.

8    Q.  Okay.  Well, let's read that letter.  The sentence before that.  Dr.
9    Romano says in the one, two, three, fourth line down, see the sentence that
10   starts <u>although he</u>?

11   A.  Um-hmm.

12   Q.  It says <u>he is disabled</u>.  Correct?

13   A.  It says: <u>Mr. Olsen is diagnosed with major depression, a condition</u>
14   <u>that he has had for many years.  I understand you have concerns regarding his</u>
15   <u>disability to live on his own at Glenwood.   Although he is disabled, he</u>
16   <u>qualifies for independent living.</u>

17   Q.  Okay.  Up earlier, where it says Mr. Olsen is diagnosed with major
18   depression.  Correct?

19   A.  Yes.  That is what it says.

20   Q.  Okay.  The sentence you just read to the jury about <u>I understand</u>
21   <u>you have concerns regarding Mr. Olsen's ability to live on his own at</u>
22   <u>Glenwood,</u> would you agree with that, you have those concerns?

23   A.  I needed to find out if Donald was essential to the economic support
24   of his parents or vice versa.

25   Q.  Yes, you have said that before.  But do you agree with that sentence
26   from Dr. Romano's letter?

27   A.  I'm not a doctor.  I'm not equipped to say if someone is depressed
28   or not.  I just have to apply the language that my attorney has advised me to
29   put in a lease and see if that resident meets the clause of my lease.  That's all
30   I'm qualified to do.

1       Q.  Okay.  Let's step back from Dr. Romano's letter and I'll just ask you
2    straight out.

3       Did you have a concern at that time about whether Donald Olsen could
4    live alone, on his own, at Glenwood?

5       A.  I had a concern that he, if he was providing economic or physical
6    care to his parents and vice versa.

7 (Tr. 287-89 (italics in original).)

8    Stark did not contact Dr. Romano "to ask him what he meant by the letter."  (<u>Id</u>.

9 at 291.)  Stark testified, "The letter from the doctor allowed me to apply the language of my lease to

10 his situation."  (<u>Id</u>. at 289.)

11    Stark denied the request for Donald's residency in a letter that stated as follows:

12 Dear Mrs. Olson [<u>sic</u>]:

13       This letter will formally notify you of Stark Homes' denial of your
14    request for residency for your son.  We cite page 1, section A of our Residency
15    Agreement which states:

16      "........**All residents must have attained the age of 55 to reside in Glenwood**
17    **Village.  Management reserves the right to reject any resident who does not**
18    **qualify under the community's age restriction."**

19       Further page 4, section 9 cites:

20      ....."**Adults under 55 may be admitted as residents, if it is**
21    **established to the satisfaction of the Community's management that the**
22    **presence of such persons is essential to the physical care or economic**
23    **support of the resident.  The management has full authority to qualify**
24    **that resident and reserves the right to approve or reject that person as a**
25    **resident"**.

26       Thank you.

27 (Letter from W. Brian Stark to Barbara Olson [<u>sic</u>] dated February 5, 2008 (italics and bolding in

28 original).)

1    After receiving this letter, Barbara called Stark and "asked him if he would reconsider.

2    He said:  Absolutely not.  My mind is made up.  I will not change it.  And I don't need any trouble in

3    this park like that."  (Tr. 83-84 (italics in original).)

4    B.  Assistance and Investigation by LIHS

5    Following Stark's refusal to reconsider, Donald Jr. enlisted the assistance of LIHS (see

6    Tr. 131), which sent Stark Homes a letter requesting a relaxation of the Lease's minimum age

7    restriction in order to allow Donald Jr. to live at Glenwood with his parents.  The letter, signed by

8    Senior Fair Housing Investigator Marian D. Reid, stated, inter alia, that "[f]or the past few years,

9    Donald Jr. has been living with his parents because he suffers from a disability"; that "it would be

10   extremely important that Donald Jr. reside with his parents because of his own disability"; and that

11   "[i]f Donald Jr. is not able to reside with Mr. and Mrs. Olsen, he could elapse [sic] and again suffer

12   from a mental breakdown."  (Letter from Marian D. Reid to Brian Stakes [sic] dated March 4, 2008

13   ("LIHS Letter") at 1-2.)

14   The LIHS Letter stated that Donald Jr. was "a person with a disability as defined by

15   the Federal Fair Housing Amendments Act of 1988" (id. at 1) and that if a reasonable accommodation

16   were not made within 10 days, legal action would be pursued (see id. at 2).  Stark received the LIHS

17   Letter but did not respond.  (See Tr. 291-93.)

18   Reid testified that, having failed to persuade Stark to change his decision, LIHS in late

19   March began a testing investigation at Glenwood.  (See id. at 194, 200.)  For such an investigation,

20   LIHS trains testers to pose as prospective purchasers and to inquire about the availability of housing.

21   Testers record their interactions, and a test coordinator compares the reports to assess whether testers

1    were treated differently based on protected class status.  Three testers visited Glenwood.

2              The first tester ("Tester 1") visited Glenwood on March 24, 2008.  She told Grossklaus

3    and Stark she would be 55 years old in May and would be living with her sister who was 49; she

4    asked whether her sister's age posed any problem.  (See Deposition of Rita Simonetti at 10.)  There

5    was no indication that either Tester 1 or her sister had any disability.  (See id. at 24.)  Grossklaus said

6    the sister's age was an issue for Stark to resolve; Stark said "it wasn't going to be a problem as long

7    as there weren't any young children involved" (id. at 12).  Stark then spent some 90 minutes showing

8    homes to Tester 1.

9              The second tester ("Tester 2"), who visited Glenwood around March 28, 2008, testified

10   that she told Stark she had just turned 54 years of age, hoped to move in by the end of May, and was

11   planning to live alone.  (See Tr. 226-29.)  Stark made no comment with respect to her age except to

12   suggest that she looked younger.  Stark spent an hour with her, showing various units and discussing

13   financing options; he invited Tester 2 to return to look at homes again.  (See id. at 228-30.)

14             The third tester ("Tester 3") testified that she visited Glenwood in July 2008 and met

15   first with Grossklaus.  Tester 3 said she was over the age of 55 and was planning to reside with her

16   40-year-old mentally disabled daughter.  (See id. at 240-41.)  Grossklaus asked if the daughter was

17   violent; receiving a negative answer, Grossklaus said approval for the daughter's residence would be

18   needed from Stark.  (See id. at 241.)  After Stark arrived and, apparently, was informed by Grossklaus

19   about the daughter, he asked Tester 3 whether the daughter was on medication.  He said "he would

20   have to meet her before he c[ould] make a decision about [Tester 3] buying a unit."  (Id. at 242.)

21   Stark said he had another family living there with a mentally disabled son who had been found outside

22   naked.  (See id.)

-11-

1    C.  Other Testimony by Donald Jr. and Testimony by Dr. Romano

2          Donald Jr. testified that he had attempted suicide several times.  (See Tr. 113, 116-18.)

3    After his second attempt in 2004 he was hospitalized, and the hospital refused to release him on his

4    own; he was released into the care of his parents.  Donald Jr. testified that since that time, he has

5    always lived with his parents; he takes several medications, morning and night, under their

6    supervision.  (See id. at 119-21.)  He has worked intermittently, but has been unable to work full-time

7    in a permanent job and has been receiving social security disability income.  (See id. at 118-19.)  He

8    testified that his medication affects him in a way that leaves him unable to work.  (See id. at 113,

9    116-17.)

10          Dr. Romano testified that Donald Jr.'s major depression "[a]bsolutely" affected his

11    ability to work (id. at 170-71), interfering with his ability to maintain employment (id. at 172).  Dr.

12    Romano testified that he had been treating Donald Jr. since about 2007 at Opti HealthCare, an

13    outpatient mental health clinic, for major depression and anxiety.  (See Tr. 169-70.)  Donald Jr. had

14    therapy sessions with Dr. Romano weekly and sessions at Synergy Center, another outpatient center

15    for mental health patients, daily.  (See id. at 170; see also id. at 133 (Donald Jr. testified he attended

16    sessions at Synergy Center five times a week).)

17          Dr. Romano testified that he had written his January 2008 Letter because Donald Jr.

18    informed him that Stark Homes "had requested something from his therapist, myself, to indicate that

19    he could live, he can live in that facility."  (Id. at 172-73 (emphasis added).)  After reading his letter

20    aloud, including the sentences stating that Donald Jr. "qualifie[d] for independent living" and had the

21    "ability to live independently . . . without question," Dr. Romano explained what he had meant:

22          Q. Now, at the time that you prepared this letter, were you aware that
23          Donald was living with his parents?

1          A.  Yes.

2                 . . . .

3          Q.  . . . .  At the time you wrote this letter, did you know that Donald
4     intended to live with his parents at Glenwood?

5          A.  Yes, sir.

6          Q.  And you used the term in there <u>independent living</u>.  What does that
7     mean?

8          A.   Well, in the case of individuals with mental health issues,
9     independent living typically means they don't need to be living in a restricted
10    environment.  They're not hospitalized.  They're not living in a group home
11    setting.

12          But they have supports in their life.  In Don's case it would be Synergy
13    and his parents.  So in that case he is living as independently as he possibly
14    can.

15   (Tr. 174-75 (italics in original).)

16          Dr. Romano testified that his January 2008 Letter saying that Donald Jr. could live

17   independently "didn't mean what [Dr. Romano] wanted it to say"; "that someone reading that letter

18   would interpret it based on what it said"; and that he "would assume" that "if Glenwood Village read

19   this letter, it is a reasonable interpretation that [Donald Jr.] could live independently without support."

20   (<u>Id</u>. at 178.)

21          Dr. Romano also testified about a letter he had written to LIHS in 2009, for the purpose

22   of

23          clarifying the original letter because I hadn't made it clear that independent
24     living was not, it didn't mean that he could live totally on his own; that he did
25     need support.

26                 . . . .

27          Q.  . . . [W]hy did you prepare this letter?

1                  A. There was some question--after the first letter, it was, I guess it was
2                believed that Don could live totally on his own without support.  Or that was
3                implied, I guess.

4                  And this was to clarify that he could live for short periods of time on
5                his own or if his parents were away, but he did need those supports, such as
6                Synergy and his parents, long term.

7   (Id. at 176.)

8   D.  The District Court's Dismissal of Plaintiffs' Claims

9                  Following the close of evidence, each side moved, in whole or in part, for judgment

10  as a matter of law.  Defendants' motion was as follows:

11               MR. CIARELLI [Counsel for defendants]:  My motion is for a directed
12             verdict, your Honor, because they haven't proven that Donald Olsen is
13             suffering from a disability.

14               There is no medical proof.  There is no physician.  No psychiatrist.  No
15             qualified psychologist even saying that, expressing an opinion in this case that
16             Donald Olsen suffers from a disability.  Their disability is self-defined.

17                   . . . .

18               So that there is no proof in this case that would be sufficient for a
19             reasonable jury to conclude that his major life activities, he is prevented from
20             performing his major life activities.

21               Now, he drives.  He goes to Albany to talk to legislators.  He is an
22             activist in that psychological organization.  And he chooses to volunteer to
23             cook for an agency that he participates in.

24               But that is not our burden.  Our burden is to recognize an established
25             disability.  And in this particular case, there is insufficient evidence in the case
26             to support that disability.

27               The statute requires that he cannot perform his life's major activities,
28             and there is nothing that is major that Mr. Olsen can't perform.

29               And as far as the discrimination is concerned, I think it is pretty

1  obvious that the only documentation presented to Glenwood in support of any,
2  in support of their request for an accommodation or otherwise is this letter of
3  Dr. Romano, who even Dr. Romano admits is a statement that Donald Olsen
4  could live independently, meaning without support.

5  There is no reasonable jury that could conclude that Mr. Stark was
6  required to read behind the words that were stated in that letter and try to
7  anticipate what Dr. Romano was trying to say when even Dr. Romano says
8  that somebody reading that letter would take it for what it says in the letter,
9  and that is that Donald Olsen, Jr could live independently, without question.

10  It also describes the activities that he pursues, in that letter. And it also
11  describes his major depression, which there is never any, any, whether in this
12  record or otherwise, any reliable medical support for or reliable evidentiary
13  support for the conclusion that that letter or anything that was presented to
14  Glenwood supported Donald's need to live with them.

15  (Tr. 308-10.) Defendants' attorney also argued that "no reasonable jury could credit the Olsens'

16  testimony" because they had "lie[d] under oath" (id. at 310)--presumably referring to differences

17  between testimony in deposition and testimony at trial.

18  In opposition to defendants' motion, the Olsens' attorney argued that, as to whether

19  Donald Jr. had a disability,

20  [w]e are not required to present expert testimony on disability. The Olsens
21  testified he had major depression. Dr. Romano's letter indicates he has major
22  depression. Dr. Romano's letter says he is disabled. Dr. Romano and the
23  Olsens all testified as to the daily life activities that are affected by his
24  depression. He gets socially isolated. It affects his ability to sleep. It affects
25  his ability to maintain employment. It has resulted in several hospitalizations
26  and suicide attempts. He receives Social Security disability income. He takes
27  medication. He goes to weekly therapy.

28  THE COURT: But what is the doctor, what letter did you provide to
29  the defendants from his own doctor? What did it say?

30  MR. DANE: It said Donald suffers from major depression. He has a
31  disability. He can live independently.

32  THE COURT: He can live independently.

-15-

1          And what did the doctor say when he was on the stand about that?

2          MR. DANE:  Well, there are two things about that.

3          No. 1, the letter is couched in terms of can he live at Glenwood.  That
4    is with his parents.

5          And the living independently Dr. Romano said means he didn't have
6    to go to a care home.  He didn't have to go to be institutionalized or go into a
7    hospital.

8          Now, the defendants are saying they interpret it a different way.  You
9    know, okay, that is their argument.  But that doesn't mean as a matter of law
10   that he is not disabled.

11   (Tr. 311-12.)

12         The Olsens also moved for judgment in their favor as a matter of law on the reasonable

13   accommodation claim, arguing that they had proven all of the elements of that claim and that

14   defendants' reliance on the Glenwood Lease as a basis for their refusal was insufficient as a matter

15   of law.  (See id. at 314.)  LIHS joined the Olsens' opposition to defendants' motion for judgment as

16   a matter of law and the Olsens' motion for judgment as a matter of law in their favor on the reasonable

17   accommodation claim (see id.); however, LIHS conceded that if that claim were dismissed as to the

18   Olsens, it would be dismissable as to LIHS as well (see id. at 306-07).  LIHS argued, however, that

19   its claim of discrimination is independent of the discrimination claims of the Olsens, given that the

20   LIHS testers were treated differently by Stark depending on whether or not they said the under-the-

21   age-of-55 family members who were to live with them at Glenwood were disabled.   (See id.

22   at 314-15.)

23         The district court granted defendants' motion to dismiss all of plaintiffs' claims, stating

24   as follows:

25         This is the decision of the court based upon the testimony during trial and on

-16-

1              oral argument.

2                    There is no causation.  The case is being dismissed.

3                    First, we refer to the doctor's letter of January 31, 2008, where the
4              doctor is requested to give his interpretation.

5                    In the letter it says:

6                    "I understand that you have concerns regarding Mr. Olsen's ability to
7              live on his own at Glenwood.  Although he is disabled, he qualifies for
8              independent living."

9                    Continuing on:  "In [sic] my clinical opinion, [sic] Mr. Olsen's ability
10             to live independently is without question."

11                   Now, this was the letter sent to the defendants for them to make a
12             decision.  It has nothing to do with whether he is disabled or not but whether
13             he can live independently, and that is what they found.

14                   It is true that on March 5, 2009, after the decision was made, a new
15             letter was created by the doctor, which was never given to the defendants.
16             That letter says:

17                   "Although at points in his life Mr. Olson [sic] has been able to live
18             independently, his depression has dominated his life, as evidenced by
19             numerous relapses and hospitalizations.  At the present time and for the future
20             time, Mr. Olson [sic] is unable to live on his own and requires the constant
21             support of his family as well as continued psychotherapy."

22                   If this letter was sent to the defendants, that would be a cause of action,
23             but not based upon the letter sent.  And, not only that, the testimony of the
24             doctor.

25                   "Question:  As a matter of fact, do you recall saying at your deposition
26             that your definition of independent living is living without support?

27                   Answer:  That would be--yes.  If someone was living independently,
28             the way we normally would think of it, they [would] need no supports.

29                   Question:  But the letter says that, 'It is my clinical opinion that Mr.
30             Olsen's ability to live independently is without question.

31                   Answer:  Right."

                                            -17-

1      Then continuing.

2      "Question:  So if Mr.--if Glenwood Village read this letter, it is a
3      reasonable interpretation that Mr. Olson [sic] could live independently without
4      support."

5      And then this answer by the doctor, the expert, the treating physician,
6      called by the plaintiff [sic]:

7      "I would assume so."

8      So this case does not turn on whether he has a psychological problem
9      or not.  Can he live independently?

10     There is no evidence whatsoever that based on his depression he was
11     treated adversely.  The question was simply can he live independently or not,
12     did he need their support, and there is nothing in the record to support that.

13     Therefore, the case is dismissed.  All actions.

14     (Tr. 315-17 (italics in original).)

15                                    II.  DISCUSSION

16     On appeal, plaintiffs contend principally that the district court erred in dismissing their

17     claims as a matter of law, and that the court should have granted judgment as a matter of law in their

18     favor on the reasonable accommodation claim.  In addition, LIHS argues that even if the claims

19     brought by the Olsens were properly dismissed, there was sufficient evidence to permit LIHS's own

20     independent claim for discrimination to be submitted to the jury.  It also contends that the court erred

21     in excluding evidence of findings by a New York administrative agency that defendants had

22     discriminated against the Olsens.

23     Defendants contend that the entry of judgment as a matter of law in their favor should

1    be upheld, arguing principally that the evidence was insufficient to show (a) that Donald Jr. was

2    handicapped within the meaning of the FHA, (b) if he was, that defendants knew or had reason to

3    know that he was handicapped, and (c) that they discriminated against him on the basis of handicap.

4    They also argue that dismissal of the claims of LIHS may be upheld on the ground that LIHS failed

5    to show injury to itself sufficient to give it standing to join this action.

6              For the reasons that follow, we conclude that the district court properly declined to

7    grant judgment as a matter of law in favor of plaintiffs on the reasonable accommodation claim, but

8    that, as to all of plaintiffs' claims, the evidence was sufficient to preclude the granting of judgment

9    in favor of defendants as a matter of law.


10   A. Federal and State Laws Prohibiting Discrimination in Housing

11              The FHA, with exceptions not pertinent here, makes it unlawful

12              [t]o discriminate in the sale or rental, or to otherwise make unavailable or
13              deny, a dwelling to any buyer or renter because of a handicap of--

14                   (A) that buyer or renter, [or]

15                   (B) a person residing in or intending to reside in that dwelling after it is so
16                   sold, rented, or made available . . . .

17   42 U.S.C. §§ 3604(f)(1)(A) and (B) (footnote omitted) (emphases added).  HUD regulations interpret

18   dwellings to include mobile home parks.  See Implementation of the Fair Housing Amendments Act

19   of 1988, 54 Fed. Reg. 3232, 3238 (Jan. 23, 1989) ("HUD 1989 FHA Reg."); Edwards v. Marin Park,

20   Inc., 356 F.3d 1058, 1063 n.6 (9th Cir. 2004) ("A plot leased for siting of a mobile home is a

21   'dwelling' under the FHA."); Morgan v. Secretary of Housing and Urban Development, 985 F.2d

22   1451, 1454 n.3 (10th Cir. 1993) ("Mobile home lots for rent are considered dwellings under and

-19-

1    within the scope of the Fair Housing Act.").

2          "Handicap" is defined in the FHA to include a "mental impairment which substantially

3    limits one or more of [a] person's major life activities."   42 U.S.C. § 3602(h)(1).   Under HUD

4    regulations, such an impairment includes "emotional illness," 24 C.F.R. § 100.201(a)(2); and "[m]ajor

5    life activities" are defined as "functions such as caring for one's self, performing manual tasks,

6    walking, seeing, hearing, speaking, breathing, learning and working," id. § 100.201(b).

7          Nonetheless, a housing provider is "not preclude[d] . . . from lawfully rejecting [a]

8    particular applicant," "[j]ust because [that] applicant for housing has a handicap." HUD 1989 FHA

9    Reg., 54 Fed. Reg. at 3245. The provider is simply required to use "the same standard of performance

10    and behavior (e.g., tenant selection criteria) to which it holds others" with respect to such "concerns

11    as past rental history, violations of rules and laws, [and] a history of disruptive, abusive, or dangerous

12    behavior." Id.

13          In order to make out a prima facie case of discrimination on the basis of disability in

14    violation of FHA § 3604(f)(1)(B), a plaintiff must show (1) that a person residing in or intending to

15    reside in the dwelling after its sale or rental to the plaintiff had a handicap as defined in the FHA, (2)

16    that the plaintiff sought and was qualified to purchase or rent the housing, (3) that he was rejected,

17    and (4) that the rejection occurred in circumstances giving rise to an inference of discrimination on

18    the basis of the handicap of the person residing or intending to reside with the plaintiff. See generally

19    Mitchell v. Shane, 350 F.3d 39, 47 (2d Cir. 2003). If the plaintiff has made out a prima facie case,

20    the burden of production shifts to the defendants to come forward with "a legitimate,

21    nondiscriminatory reason for their decision." Regional Economic Community Action Program, Inc.

22    v. City of Middletown, 294 F.3d 35, 49 (2d Cir. 2002). The ultimate burden of proof remains on the

1    plaintiff to show that "the defendants intentionally discriminated against [him] on a prohibited

2    ground." Id.  If the plaintiff "make[s] a substantial showing that the defendants' proffered explanation

3    was false, it is permissible for the trier of fact to infer the ultimate fact of discrimination from the

4    falsity of the [defendants'] explanation." Id. (emphasis and internal quotation marks omitted).

5            New York's HRL, with exceptions not pertinent here, contains provisions prohibiting

6    housing discrimination similar to those in the FHA:

7            It shall be an unlawful discriminatory practice for the owner . . . or managing
8            agent of, or other person having the right to sell, rent or lease a housing
9            accommodation, constructed or to be constructed, or any agent or employee
10           thereof:

11                   (1) To refuse to sell, rent, lease or otherwise to deny to or
12           withhold from any person or group of persons such a housing
13           accommodation because of the . . . disability . . . of such person or
14           persons . . . .

15   N.Y. Exec. Law § 296(5)(a)(1).  Claims under the FHA and HRL § 296 are "evaluated under the same

16   framework." Mitchell v. Shane, 350 F.3d at 47 n.4.


17   B.  Principles Governing Motions for Judgment as a Matter of Law

18           Rule 50(a) provides that if "a party has been fully heard on an issue during a jury trial

19   and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find

20   for the party on that issue, the court may . . . grant a motion for judgment as a matter of law against

21   the party." Fed. R. Civ. P. 50(a)(1)(B).

22           [I]n entertaining a motion for judgment as a matter of law, the court should
23           review all of the evidence in the record.

24                   In doing so, however, the court must draw all reasonable inferences in
25           favor of the nonmoving party, and it may not make credibility determinations
26           or weigh the evidence. . . .  Credibility determinations, the weighing of the

1        evidence, and the drawing of legitimate inferences from the facts are jury
2        functions, not those of a judge. . . .  Thus, although the court should review the
3        record as a whole, <u>it must disregard all evidence favorable to the moving party</u>
4        <u>that the jury is not required to believe.</u>

5  <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 150-51 (2000) (internal quotation marks

6  omitted) (emphases added).

7        In reviewing a district court's ruling on a motion for judgment as a matter of law, we

8  apply the same standard that is required of the district court.  <u>See</u>, <u>e.g.</u>, <u>Zellner v. Summerlin</u>, 494 F.3d

9  344, 371 (2d Cir. 2007).  "We 'consider the evidence in the light most favorable to the party against

10  whom the motion was made and . . . give that party the benefit of all reasonable inferences that the

11  jury might have drawn in his favor from the evidence.'"  <u>Id</u>. (quoting <u>Black v. Finantra Capital, Inc.</u>,

12  418 F.3d 203, 209 (2d Cir. 2005)).  "We 'disregard all evidence favorable to the moving party that the

13  jury is not required to believe.'"  <u>Zellner v. Summerlin</u>, 494 F.3d at 371 (quoting <u>Reeves</u>, 530 U.S.

14  at 151).


15  C.  <u>Dismissal of the Discrimination Claims</u>

16        The main thrust of defendants' motion for judgment as a matter of law, as shown in the

17  transcript quoted in Part I.D. above, was that plaintiffs "ha[d]n't proven that Donald [Jr.] is suffering

18  from a disability" (Tr. 308).  They argued that there was "no medical proof":  "no physician[, n]o

19  psychiatrist[, n]o qualified psychologist even saying that, expressing an opinion in this case that

20  Donald [Jr.] suffers from a disability" (<u>id</u>.); and they argued that there was no evidence that there was

21  any major life activity that Donald Jr. could not perform (<u>id</u>. at 309).

22        The contention that there was no medical evidence as to Donald Jr.'s disabling

23  condition was belied by the record itself, and the district court did not adopt that argument.  Dr.

1    Romano, referred to by the district court as "the expert" (id. at 317), was Donald Jr.'s clinical

2    psychologist.  Dr. Romano opined that Donald Jr. suffered from major depression and anxiety.  Nor

3    did the court endorse defendants' argument that there was no major life activity that Donald Jr. could

4    not perform.  Although the evidence plainly indicated that Donald Jr. was not totally dysfunctional,

5    "working" is a major life function, 24 C.F.R. § 100.201(b), and there was evidence that even when

6    taking his prescribed medications--which Donald Sr. testified Donald Jr. would not take without

7    parental supervision--Donald Jr. could not engage in full-time or permanent work.  Dr. Romano

8    testified that Donald Jr.'s depression "[a]bsolutely" interfered with his ability to work.  (Tr. 170-71.)

9         Rather, the district court ruled that there was no evidence that Donald Jr.'s disability

10   was the reason for defendants' rejection of his parents' request that he be allowed to live with them

11   at Glenwood Village.  In finding that defendants did not reject the senior Olsens' application to allow

12   Donald Jr. to live with them at Glenwood because of Donald Jr.'s disability (see, e.g., Tr. 315, 317),

13   the court stated that Dr. Romano's "letter [was] sent to the defendants for them to make a decision.

14   It has nothing to do with whether he is disabled or not but whether he can live independently, and that

15   is what they found" (id. at 316 (emphasis added)).  But the dismissal on this ground did not apply the

16   above standards governing decisions on motions for judgment as a matter of law, for there was

17   evidence from which the jury could have reached contrary conclusions.

18        First, Stark testified at his deposition--and confirmed at trial--that "[t]he doctor's note

19   that I asked for was evidence of his disability."  (Id. at 287.)  Whether this sentence was meant

20   literally or instead meant that Stark asked for evidence of disability, it belies any suggestion that

21   Stark's request had "nothing to do with whether [Donald Jr. was] disabled."  Second, the Romano

22   Letter in fact explicitly dealt with whether Donald Jr. was disabled.  Its first substantive sentence--

-23-

1    which was not included among the parts of the letter read by the district court in announcing its

2    decision--stated, "Mr. Olsen is diagnosed with Major Depression, a condition he has had for many

3    years."

4            Third, there was ample evidence that the letter was provided in response to a concern

5    expressed by Stark as to whether, if Donald Jr. lived at Glenwood with his parents, he would be able,

6    in light of his disability, to get along on his own for short periods of time if they were not there.

7    Barbara testified that Stark "asked me if I could get a letter from Donald's doctor stating his disability

8    and what it was and if he could be left alone for a short period of time." (Tr. 83 (emphases added).)

9    Donald Jr. testified, "My mother told me that Mr. Stark had called and he requested a letter from Dr.

10    Romano stating my disability and if I could be left alone for a certain period of time while they're on

11    vacation" (id. at 124-25 (emphases added)), and that was the request he relayed to Dr. Romano (see

12    id. at 125). Dr. Romano confirmed that that was the information relayed to him: that Stark Homes

13    "had requested something from his therapist, myself, to indicate that [Donald Jr.] could live, he can

14    live in that facility" (id. at 172-73 (emphasis added)). And the Romano Letter itself stated, "I

15    understand that you have concerns regarding Mr. Olsen's ability to live on his own at Glenwood"

16    (emphases added).

17            Thus, the explicit premise of the views stated in the letter defendants received from

18    Dr. Romano was that Donald Jr. would be living "at Glenwood." The application to live at Glenwood

19    was made by Donald Jr.'s parents; there was no suggestion whatever that Donald Jr. himself was an

20    applicant or that he would be living at Glenwood without his parents. An interpretation of the letter

21    as addressing whether Donald Jr. could live alone generally, away from Glenwood Village, ignored

22    the letter's stated context.

1          Although defendants' motion for judgment as a matter of law argued that Stark should

2    not have been required "to read <u>behind</u> the words" of Dr. Romano's letter (Tr. 309 (emphasis added)),

3    a rational juror could have found that Stark could not properly take the Romano Letter at face value

4    without considering all of its features.  Moreover, the jury would have been entitled to find that, in

5    order for Stark to recognize that the context of Dr. Romano's response was not in fact whether Donald

6    Jr. was capable of living alone generally, Stark had no need to go beyond the letter's own words; the

7    qualifying phrase "at Glenwood" spoke for itself.  Dr. Romano's testimony that he "would assume"

8    it would have been reasonable for Stark Homes to interpret his letter as meaning that Donald Jr. could

9    generally live independently, away from Glenwood, without any support at all (<u>id</u>. at 178) was an

10    assumption the jury would not have been required to make or credit.

11          Finally, the district court's statement that Donald Jr.'s ability to "live independently . . .

12    <u>is what [defendants] found</u>" (<u>id</u>. at 316 (emphasis added)), and its ultimate finding that Donald Jr. was

13    not rejected "based upon his depression" (<u>id</u>. at 317), apparently credited the testimony of Stark.

14    However, as discussed in Part II.B. above, assessments of credibility are solely within the province

15    of the jury, which can choose to believe some parts and disbelieve other parts of any given witness's

16    testimony.  The jury would not have been required to credit Stark's assertions that he simply

17    understood the Romano Letter to mean that Donald Jr. was able to live independently as a general

18    matter, divorced from any need to live with his parents who, by hypothesis, would be living at

19    Glenwood Village.  Thus, the court, in ruling on defendants' motion for judgment as a matter of law,

20    was required to disregard Stark's testimony that defendants' rejection of Donald Jr. was unrelated to

21    his handicap.

22          With the evidence taken in the light most favorable to plaintiffs, the jury would have

1    been entitled (a) to credit Barbara's testimony that the concern Stark expressed to her was whether

2    Donald Jr. could be on his own for limited periods of time when his parents, with whom he would be

3    living at Glenwood Village, were away, particularly as her version of Stark's request was supported

4    by the testimonies of Donald Jr. and Dr. Romano and by the language of the Romano Letter itself, and

5    was undisputed by Stark; (b) to take into account Stark's testimony that the senior Olsens were

6    approved to live at Glenwood without Donald Jr.; and (c) to infer that when Stark, in refusing to

7    reconsider his rejection of Donald Jr., told Barbara that he "d[id]n't need any trouble in this park like

8    that," that "trouble . . . like that" was a reference to Donald Jr.'s emotional illness, given that no other

9    interpretation of that statement appears in the record, and given that when LIHS Tester 1, without

10   indicating the presence of any handicap, told Stark she wanted to live at Glenwood with her sister who

11   was 49, Stark said there would be no problem.

12              Further, the jury could have viewed Stark's position, that Dr. Romano's letter meant

13   that Donald Jr. could live independently without any support, as unreasonable.  And it could have

14   found from Stark's selective focus on statements taken out of context and from his testimony that

15   "[t]he letter from the doctor underlined allowed me to apply the language of my lease to [Donald Jr.'s] situation"

16   (Tr. 289 (emphasis added)), that his chosen interpretation of the Romano Letter was opportunistic and

17   disingenuous.

18              The jury is not, of course, required to view the evidence in the light most favorable to

19   either side.  But as the evidence in this case, taken in the light most favorable to plaintiffs, as the court

20   was required to view it in considering defendants' motion, would have allowed the jury to find in

21   favor of plaintiffs, we conclude that the dismissal of the federal and state-law discrimination claims

22   as a matter of law was error.

-26-

1    That said, it is not clear that the housing discrimination laws provide Donald Jr.

2    himself with a cause of action for intentional discrimination.  For example, the FHA makes it unlawful

3    to discriminate against a "buyer or renter," 42 U.S.C. § 3604(f)(1), who "sought and w[as] qualified

4    to rent or purchase the housing," Mitchell v. Shane, 350 F.3d at 47, and Donald Jr. himself did not

5    seek to be a Glenwood lessor.  However, as defendants did not raise this issue on appeal, we decline

6    to address it, and we leave it for further exploration on remand.


7    D.  Dismissal of the Reasonable Accommodation Claims

8    The FHA also prohibits a housing provider's "refusal to make reasonable

9    accommodations in rules, policies, practices, or services, when such accommodations may be

10   necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling." 42 U.S.C.

11   § 3604(f)(3)(B).  The HRL likewise makes it unlawful "[t]o refuse to make" such accommodations.

12   N.Y. Exec. Law § 296(18)(2).

13   In order to prove a failure-to-accommodate claim, a plaintiff must show (1) that the

14   plaintiff or a person who would live with the plaintiff had a handicap within the meaning of § 3602(h);

15   (2) that the defendant knew or reasonably should have been expected to know of the handicap; (3) that

16   the accommodation was likely necessary to afford the handicapped person an equal opportunity to use

17   and enjoy the dwelling; (4) that the accommodation requested was reasonable; and (5) that the

18   defendant refused to make the requested accommodation.  See, e.g., Astralis Condominium Ass'n v.

19   Secretary, U.S. Department of Housing and Urban Development, 620 F.3d 62, 67 (1st Cir. 2010);

20   DuBois v. Association of Apartment Owners of 2987 Kalakaua, 453 F.3d 1175, 1179 (9th Cir. 2006).

21   "Plaintiffs must show that, but for the accommodation, they likely will be denied an equal opportunity

-27-

1    to enjoy the housing of their choice." Tsombanidis v. West Haven Fire Department, 352 F.3d 565,

2    578 (2d Cir. 2003) (internal quotation marks omitted).  Requested accommodations are reasonable

3    where the cost is modest and they do not pose an undue hardship or a substantial burden on the

4    housing provider.  See, e.g., Taylor v. Harbour Pointe Homeowners Ass'n, 690 F.3d 44, 49 (2d Cir.

5    2012).

6            In the present case, there appears to be no dispute as to elements (3), (4), and (5).

7    Given Glenwood Village's operation as a residential community for persons age 55 or older,

8    permission for Donald Jr., age 42, to live there because of his handicap would have required a

9    relaxation of the Stark Homes policy as expressed in the Glenwood Lease, which defendants refused.

10   Defendants do not contend that that requested accommodation was unreasonable; Stark testified that

11   allowing Donald Jr. to reside at Glenwood would not have imposed on Stark Homes any financial or

12   administrative burden (see Tr. 285) and would not have endangered Glenwood's status under the

13   FHA, see 42 U.S.C. § 3607(b) (exempting, under certain conditions, housing intended for residents

14   age 55 or older from FHA protections for families with children), as a permissible 55-and-over

15   community (see id. at 296-97).  Rather, defendants' motion for judgment as a matter of law argued

16   that there was insufficient evidence (1) that Donald Jr. was handicapped, and (2) in light of Dr.

17   Romano's letter, that defendants should have known he could not live independently of his parents.

18           For the reasons set out in Part II.C. above, the evidence, taken in the light most

19   favorable to plaintiffs, was sufficient for the jury to find those two elements satisfied.  The jury could

20   have found that Donald Jr. suffered from major depression which, even when he took his medications

21   as prescribed, prevented him from working; and that unless he lived with his parents who would

22   supervise him in the taking of those medications morning and night, he was prone to not taking the

1    medications and would become suicidal.  And although defendants had not been given details as to

2    the course and history of Donald Jr.'s condition, it would have been permissible for the jury to find

3    that defendants had been sufficiently informed as to his disability and his need to live with his parents.

4    We conclude that the district court should not have dismissed the reasonable accommodation claim

5    as a matter of law.

6            By the same token, however, we reject plaintiffs' contention that, on the reasonable

7    accommodation claim, the district court should have granted judgment as a matter of law in their

8    favor.  In connection with the motion by plaintiffs, the court was required to view the evidence in the

9    light most favorable to defendants.  Taken in that light, the jury could have been unpersuaded that

10    defendants, to whom the senior Olsens did not provide details as to Donald Jr.'s history of

11    hospitalizations and suicide attempts, were required to accept at face value the senior Olsens'

12    representations that Donald Jr.'s mental illness necessitated his residing with them.  The jury could

13    also have declined to view Dr. Romano's January 2008 Letter as sufficiently clear to show that

14    defendants knew or reasonably should have known that it was necessary for Donald Jr. to live with

15    his parents and that he could not live independently.  In addition, there was evidence that Donald Jr.

16    was a volunteer cook at the facility in which he had therapy sessions five times a week, that he served

17    as a mental health advocate through that facility, and that he "work[ed] closely with [New York State]

18    Legislators in Albany, advocating for individuals with mental illness" (Romano Letter).  Viewing that

19    evidence in the light most favorable to defendants, the jury could have been unpersuaded that Donald

20    Jr. was unable to work--the only major life activity in which plaintiffs' evidence suggested he was

21    substantially limited.

22            In sum, there were factual issues that the jury could resolve in favor of either side.

1    Accordingly, we remand plaintiffs' federal and state-law reasonable accommodation claims, as well

2    as their discrimination claims, for trial.


3    E.  Other Arguments

4           As the case is to be remanded for trial, two other contentions by the parties warrant

5    brief mention.  LIHS contends that the district court erred in refusing to admit evidence of findings

6    made in a report of the New York State Division of Human Rights ("DHR") on the administrative

7    complaints filed by LIHS.  Defendants not only dispute this contention but contend also that the

8    dismissal of any claims by LIHS should be affirmed on the ground that LIHS lacks standing to be a

9    plaintiff.

10          As to standing, the FHA provides a right of action for an "aggrieved person," 42 U.S.C.

11   § 3613(a)(1)(A), which is defined to include "any person who . . . claims to have been injured by a

12   discriminatory housing practice," id. § 3602(i)(1).  This FHA definition of "aggrieved person" extends

13   "as broadly as is permitted by Article III of the Constitution."   Trafficante v. Metropolitan Life

14   Insurance Co., 409 U.S. 205, 209 (1972) (interpreting the substantially identical definition of "person

15   aggrieved" in the FHA as originally enacted, 42 U.S.C. § 3610(a) (1970)) (internal quotation marks

16   omitted).

17          Plaintiffs' complaint alleged that LIHS, as a not-for-profit corporation devoted to fair-

18   housing advocacy and counseling, had expended resources in investigating and advocating on the

19   Olsens' behalf.  LIHS wrote a letter to Stark Homes urging reconsideration of its denial of the Olsens'

20   application for permission for Donald Jr. to live with his parents at Glenwood; LIHS thereafter sent

21   testers to Glenwood to determine whether defendants' practices were discriminatory on the basis of

1    disability.  LIHS also prepared and pursued housing discrimination complaints on behalf of the Olsens

2    before HUD and DHR.  LIHS alleged that these activities diverted resources of LIHS from its other

3    advocacy and counseling activities.

4            These are allegations of concrete and particularized injury to LIHS sufficient to give

5    it standing to pursue its claims for reimbursement for the resources diverted.  See, e.g., Havens Realty

6    Corp. v. Coleman, 455 U.S. 363, 378-79 (1982) ("Havens"); Village of Bellwood v. Dwivedi, 895

7    F.2d 1521, 1526 (7th Cir. 1990) ("Havens makes clear . . . that the only injury which need be shown

8    to confer standing on a fair-housing agency is deflection of the agency's time and money from

9    counseling to legal efforts directed against discrimination.").  "Of course, [LIHS] will have to

10    demonstrate at trial that it has indeed suffered impairment in its role of facilitating open housing

11    before it will be entitled to judicial relief."  Havens, 455 U.S. at 379 n.21.

12            As to the admissibility of the DHR findings, the Federal Rules of Evidence provide

13    that the hearsay rule does not exclude "[a] record or statement of a public office if it sets out . . . in

14    a civil case . . . factual findings from a legally authorized investigation" and if "neither the source of

15    information nor other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8).  Rule

16    803(8) "therefore renders presumptively admissible not merely . . . factual determinations in the

17    narrow sense, but also . . . conclusions or opinions that are based upon a factual investigation,"

18    Bridgeway Corp. v. Citibank, 201 F.3d 134, 143 (2d Cir. 2000) (internal quotation marks omitted);

19    but the trial judge "has the discretion, and indeed the obligation, to exclude an entire report or portions

20    thereof--whether narrow 'factual' statements or broader 'conclusions'--that she determines to be

21    untrustworthy," Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 167 (1988).  Once the proponent of

22    the evidence "has shown that a set of factual findings satisfies the minimum requirements of Rule

-31-

1  803(8)[]," the party opposing admission bears the burden of showing a lack of trustworthiness.

2  Bridgeway Corp. v. Citibank, 201 F.3d at 143.

3         At the trial here, when LIHS asked a witness whether there had been an administrative

4  finding, the district court sustained defendants' objection and precluded this line of questioning,

5  stating, apparently in reference to the administrative proceedings, that "[t]here was no right to be

6  heard, no given opportunity to be heard." (Tr. 209.)  Defendants argue that LIHS cannot show that

7  "the court's refusal to admit the hearsay statement constituted an abuse of discretion" because LIHS

8  failed to offer the DHR report in evidence and failed to lay an evidentiary foundation for its

9  admission.  (Defendants' brief on appeal at 49.)

10        The trial transcript indicates that plaintiffs may have been forestalled from laying a

11  foundation (see Tr. 209), and that there may not have been a full exploration of the DHR report's

12  trustworthiness.  We leave it to the district court to rule on the admissibility of the report, if it is

13  offered, on the basis of the record as it is developed on remand.

14                                     CONCLUSION

15        We have considered all of the parties' arguments on this appeal and, except as indicated

16  above, have found them to be without merit.  For the foregoing reasons, the judgment dismissing

17  plaintiffs' claims is vacated, and the matter is remanded for trial.